## (PRIZE.)

### The St. Nicholas.—MEYER ET AL. Claimants.

A question of proprietary interest.

Where enemy's property is fraudulently blended in the same claim with neutral property, the latter is liable to share the fate of the former.

APPEAL from the circuit court of Georgia. This vessel and the cargo were libelled as prize of war. The ship was claimed by John E. Smith, the supercargo, in behalf of John Meyer, alleged to be a Russian subject residing at St Petersburg. The cargo consisted of logwood and cotton, 200 bales of which were claimed by Smith, in behalf of Platzman & Gosler, also alleged to be Russian merchants of St. Petersburg. The remainder of the cargo, consisting of 950 bales of cotton, and 58 tons of logwood, were

1816.

The
St. Nicholas.

claimed in behalf of John Inerarity, a Scotchman, domiciled at Pensacola, and an adopted Spanish subject. The vessel was restored in the district court, and the cargo condemned, except the logwood, which was restored. Both parties appealed to the circuit court, and the cause was then heard and considered; but that court, under the influence of personal considerations, rendered only a *pro forma* decree, affirming the sentence of the district court, at the same time expressing a strong opinion that both vessel and cargo were liable to condemnation. The cause had been continued at the last term of this court for farther proof, but no farther proof was produced at the present term.

The cause was argued by *Key* and *Harper*, for the appellants and claimants, and by *Pinkney* and *Charleton*, for the respondents and captors.

March 21st.

JOHNSON, J., delivered the opinion of the court as follows:

This case presents itself in this court under a cloud of circumstances unusually threatening. There is scarcely wanting in it one of those characteristics by which courts of admiralty are led to the detection of neutral fraud. Whether we consider the persons who conduct the voyage, the original character of the vessel, the time and circumstances of the transfer, the trade she has since been engaged in, the funds with which that trade has been transacted, or the manner in which it has been conducted, we find all the hopes and wishes of the adventure centering

in the hostile country.    La French, the master, is a
native Dane, a naturalized American citizen, a Rus-
sian subject, and, finally, domiciled and his family
residing in Great Britain, but (as he declares himself)
having no particular residence.   Smith, the super-
cargo, is a native Englishman, but a naturalized citi-
zen of the United States.    He has resided near 30
years in Baltimore, where the war finds him.   He
sails for Lisbon ; from thence to Great Britain ; and
is almost immediately, without showing any preten-
sions to such credit, employed by an opulent house
of trade to take charge of this adventure, with a lati-
tude of discretion which could be the result only of
long acquaintance, or very strong recommendations.
Such men are the proper instruments of belligerant
or neutral fraud ; they are the avowed panders of
the mercantile world ; their consciences are in the
market.    Having no national character or feeling,
and but very few qualms of any other kind, their
talents and fidelity to their employers, like those of
the bravo, are sought out by the projectors of iniqui-
tous adventure.    And who are Meyer, and Platzman
& Gosler ?   They are introduced in the bills of the
day as very important personages ; the one was the
owner of the ship, the other of the cargo ; but we
find them acting a part conspicuous only for its in-
significance.    They cross the stage, and disappear.
It is a circumstance which scarcely admits of ex-
planation, that Meyer never exercised a single act of
ownership over this vessel.    He resides at St. Pe-
tersburg, she is lying at Cronstadt.    He purchases
her, for aught we know, without having ever seen

1816.

The
St. Nicholas.

her, of a person whom nobody knows, and whom no-thing connects with the vessel; is introduced by a Mr. Nicholas, of Virginia, to the master, leaves him in command, and, from that time to the present, does not give him one order, nor writes a single letter to him. If we could suppose it possible, that there was no correspondence between them from the 31st of July, 1812, when the ship was purchased, to the 22d December, when she was chartered to Platzman & Gosler, at least he would have written at that time and enclosed the master a copy of the charter-party, and a letter of instructions to regulate his conduct in the distant and perilous voyage on which he was about to enter. But we find La French without one scrap of instruction from the supposed owner, and, in all things, yielding implicit obedience to the supposed agent of Platzman & Gosler, whose interests might very well have been in many things inconsistent with those of the charterer. And what is not less remarkable, although he acknowledges that he must have been eighteen months or two years master of the same ship prior to the sale to Meyer, we find nothing about him or the vessel by which we can discover who the former owner was, and when he is asked who executed the bill of sale to Meyer, his reply is, he does not know; thus leading, fairly, to a conclusion, that reasons exist now, and existed formerly, for rendering such a correspondence either unnecessary or unsafe to accompany the ship. As to Platzman & Gosler, the same observation is strikingly applicable to them. From the moment they launch their bark upon the ocean, she becomes, as to them,

a perfect derelict. Not one anxious inquiry, not one expression of feeling, is communicated by letter to their agent in London. Such, at least, we have a right to infer from the non-production of any such correspondence upon the order for farther proof. And, upon the supposition of the fairness of this transaction, the existence of letters to prove it fair, was unavoidable; for the letter of the 22d December, expressly calls for correspondence prior to that date, and having relation to this adventure. Beside that, as difficulties thickened upon the adventure in Pensacola, bills on bills were drawn upon the British house, and letters on letters sent under cover to them, it would have followed that communications would be made to the Russian house, and bills drawn for reimbursement. But over all this there rests an ominous silence.

Nor is there any intrinsic skill in the machinery of this transaction. It can neither claim the praise of genius in its invention, nor of skilful execution in the adaptation of its parts. The very inception of it is laid in a bungling artifice that would not cheat a novice in the arts of commercial evasion. It bears, on the face of it, the record of its own conviction, and confesses itself to be, what it was intended to be, nothing but a neutral cloak. The correspondents, Simpson & Co., to whom the letter of the 22d of December is addressed, are expressly instructed to attach that letter to the invoice and bill of lading, in order to support the Russian national character. This, of itself, is conclusive to show that this evidence constituted no part of the mercantile transac-

1816.

The St. Nicholas.

tion between the parties. For, when was it ever heard of that a letter, which contains in it the whole evidence upon which a correspondent purchases, advances, and negotiates to a great amount, is thus to be thrown to the winds, or returned to the hands of him who is interested in suppressing it? And every step that we advance in the progress of this transaction, we find new light breaking in upon us to make manifest its real characteristics. The letter itself, in which the whole adventure originates, bears, on the face of it, obvious symptoms of that over anxiety which never fails to accompany a conscience ill at ease. In a letter to a man, to whom such facts must have been wholly indifferent, it brings together, into one view, a number of facts to which the English merchants (at least) know that courts of admiralty are in the habit of attaching importance in deciding on questions of fraud or belligerant rights; as, for instance, to show that the ship had been previously engaged in neutral trade, they say, "After the discharge of a cargo of Russian produce at this port." And that it may appear that this adventure had not recently originated, they say, "Our friends, Messrs. A. Glennie, Son & Co., with whom we have some time corresponded on this subject," &c. This letter, which is all-important to the decision of the cause, calls forth some more remarks. It contains a singular congeries of powers, instructions, and facts. It is the only evidence we have that the vessel ever was chartered for this voyage. The only article of instructions to Meyer is to be found here; the only evidence of the right of A. Glennie & Co.

to act for Platzman & Gosler, is contained in it.
Nor is there any thing else that would have direct-
ed the house of Simpson & Co. in their transac-
tions, had that house been in existence when the
vessel arrived at Pensacola. It may well be asked,
would A. Glennie & Co. have been satisfied to part
with so important a voucher for their transactions as
agents in this large adventure, had there been any
thing real in it? Or would so many persons have
been satisfied to stake their fortunes on this itinerant
document, which was to give its light and pass on,
perhaps never to return again? But if it did not
bear upon the face of it such palpable marks of its
fictitious character, the conduct of the several per-
sons who affected to be governed by it, would suf-
ficiently show that it was a paper of no authority.
It is to be remarked that on some points this letter
of the 22d of December, in which alone Platzman
& Gosler appear in a tangible form, is explicit and
positive. On others, it yields unbounded discretion
to A. Glennie & Co. to instruct Simpson & Co., to
whom it is directed, in his conduct in that agency.
With regard to two things, it yields no discretion.
First, as to the article which is to be purchased,
which is expressly limited to cotton. Secondly, as to
the homeward destination of the ship and cargo,
which is exclusively to Gottenburgh. Yet we find
that on the 22d of February, and the 3d of March,
1813, A. Glennie & Co. give Smith instructions au-
thorizing a deviation from the orders of their prin-
cipal, not only as to the articles of which the cargo
might consist, but as to the voyage from New-Or-

leans, empowering him even to charter the vessel, and limiting him in the purchase of cotton to the price of eight cents, when Platzman & Gosler prescribe no limits, and, in fine, taking the power, both as to vessel and cargo, out of the hands of Simpson & Co., to whom the letter of Platzman & Gosler is directed, and placing the adventure altogether under the control of Smith, a man whom they appoint, for aught we know, without any authority from their principal, and whose presence was altogether unnecessary, under the supposition that Platzman & Gosler had really addressed themselves to Simpson & Co., to load the vessel on their account. But this is not all; in every step of this transaction, the parties betray a consciousness of the necessity of artifice, and in every attempt to resort to it, betray more of a disposition, than a talent, for fraud. Well aware that it is necessary to keep up a correspondence with the supposed neutral, Smith resorts to a method in which he supposes he may covertly correspond with the English house, while he keeps up the appearance of corresponding with the neutral claimant. We find a most minute detail of all his transactions, and the events of the voyage contained in a series of letters directed to Platzman & Gosler, but uniformly transmitted open, and under cover to the persons really to be informed—the hostile house. This is a shallow artifice. The belligerant must be fatuous who could be duped by it. And, unfortunately for the claimants, the letters, on the face of them, contain evidence to prove for whom they were really intended. Strike out the names of

Platzman & Gosler, and insert that of A. Glennie <span style="float:right">1816.</span>
& Co., and they will be found to be written with a
view to satisfy several passages in his general letter St. Nicholas.
of instructions, of the 2d of February, from A. Glennie & Co.

This affected correspondence with Platzman & Gosler commences on the 24th of May, 1813, and in the letter of that date, and that of the 5th of June following, there are very striking proofs of the nature and views of that correspondence. In the letter of the 25th of December, 1813, which may be called the magna charta of this adventure, it will be recollected Platzman & Gosler are made to say, that as they live in so remote a place as St. Petersburg, Simpson must receive his instructions about the cargo of cotton altogether from A. Glennie & Co.; and in the letters of the 2d of February and 5th of March, above referred to, Smith receives his instructions altogether from A. Glennie & Co., and yet when he writes to Platzman & Gosler on the 24th of May, and announces his intended voyage to Liverpool, (in express violation of their orders,) he adds, "There I shall hope to receive your instructions about the disposal of the cargo." This to the London house of A. Glennie & Co. was perfectly intelligible. It will also be recollected, that in the letters from A. Glennie & Co. of the 2d of February, Smith is expressly instructed to communicate all necessary information, so as to govern them in making insurance; and yet in these letters to Platzman & Gosler he affectedly observes, that he sends them open to A. Glennie & Co., in order to direct their conduct

in case Platzman & Gosler should have instructed them to make insurance. When to all these considerations we add, that this adventure, in fact, originates in a hostile country, and never appears to look to any other termination, and that the funds on which it was projected were altogether English, we are satisfied that the ship, and the 200 bales of cotton, laden professedly on account of Platzman & Gosler, are not owned as claimed. With regard to the ship some additional reasons might be urged; but the foregoing, as applying to that whole claim, we deem sufficient.

With regard to the claim of Inerarity, the question there rests between positive swearing and irreconcilable circumstances. And it is a melancholy truth, that forces itself upon the observation of every one who is conversant with courts of admiralty, that positive oaths are too often the most unsatisfactory evidence that can be resorted to. A species of casuistry or moral sophistry seems to have acquired too great an ascendancy over the witnesses who sometimes appear in those courts.

With regard to the logwood, nothing can be said against it, except that we find it in bad company. There is no evidence in the case which can induce a belief that it belonged to any one but Inerarity. Not so with the cotton; except in his own oath, and in the invoice, he is no where recognised, among the acting parties, as owner of this cargo. The evidence of an invoice on such a subject is literally reduced to nothing in the prize courts; and his own affidavit will be considered in due time. We will inquire into

1816.

The
St. Nicholas

the circumstances which involve him in suspicion, and see how these circumstances are explained.

It is in evidence that on the arrival of Smith at Pensacola, and his ascertaining the impracticability of loading the ship on account of his owners, at the limited price, Inerarity himself advised him, as he says, in his letter of the 24th of May, to go to New-Orleans for the purpose of endeavouring to obtain freight. From this it is evident that at that time he had no intention to embark in a shipment of cotton. The opportunity of securing this vessel at such a time would otherwise have been eagerly caught at. On going to New-Orleans Smith falls in with Milne, who finally ships the whole of this parcel of cotton through Inerarity.

The bills of lading and invoice are made out to Inerarity, but Milne transmits the cotton to him, not generally, but expressly to be laden on board this ship. In all this transaction, Milne is the real *dux facti*. He procures the cargo, for which Smith pays him a commission; he transmits the cotton; Inerarity never appears but as the agent of Milne. And when Smith speaks of the shipper, which he often does in his letters to La French, he speaks of him as Inerarity's friend.

But it is contended that, by this expression, we are to understand Inerarity himself; that he was the neutral Spaniard spoken of as the shipper in Smith's letters to Platzman & Gosler, and as no other shipper appears in the case but Inerarity's friend, and Inerarity himself, they must mean the same person. This idea is ingeniously taken up from an expression

in Smith's answer of the 12th October, to Inerarity's letter of the 6th, relative to the damage done to the cotton by water. In which letter Smith says, " As a shipper on board the St. Nicholas, my wish is to give you every satisfaction," &c. And in several of the letters to Platzman & Gosler, he speaks of the shipper as a Spaniard and neutral. But as it was evidently a part of the original arrangement, that this cotton should be shipped in the name of Inerarity, who was a neutral Spaniard, the expressions, in both those letters, are satisfied by this consideration. And if we then take Milne, as Inerarity styles him, in the letter of October the 6th, " his friend" at New-Orleans, every thing becomes intelligible. *Inerarity* is the neutral Spaniard in whose name the cotton is shipped, and *Milne* his friend at New-Orleans, with whom Smith makes his agreement about taking the cotton. It is to be remarked, that the letter of Inerarity of the 6th of October, and Smith's answer, and the letters of Smith to Platzman & Gosler, were intended to see the light. The two former as the inception of, or the ground of defence to, a legal investigation ; the latter, if necessary, to prove a legal character. It was necessary, therefore, for all the characters to assume their respective disguises. No one can believe, that when Smith was at New-Orleans urging the shipment of the cargo, every day making some new arrangement with the shipper, and writing to La French, in consequence of those agreements, to receive certain quantities of cotton from Inerarity, then at Pensacola, that he could have confounded Inerarity and his friend so very often

as he does, at the same moment when he is distin-
guishing them, not only in words, but in acts. Ano-
ther circumstance, attaching no small suspicion to
this claim, is the connexion which the evidence makes
out between the shipment by Milne and one Ralston,
who appears on the stage about the time when the
vessel first sailed. We do not mean here to attach
any importance to the evidence of Dayton. It was
utterly disregarded in the court below, and meets
with the same fate here. We do not consider it at
all necessary to the case. But that Ralston was the
person for whom Smith requests La French to pro-
vide as a passenger, and an only passenger, is proved
by the fact of his being the only passenger on board
when the vessel sailed. This person, Smith says,
was to have charge of the invoices; and this person
must be presumed to have been an American, as we
find him at large in the country in a time of war.
Whether American or Englishman, is immaterial to
the decision of this court. Smith swears, indeed,
that he had no connexion with the cargo; but Smith
himself furnishes the evidence in his letter, and tes-
timony to prove the contrary. Upon the whole,
when the above considerations are taken in conjunc-
tion with this, that it is hardly possible to assign a
reason why Inerarity should not have appeared
openly in purchasing and transmitting this cargo at
New-Orleans, they cannot but so load his claim with
suspicion, as to make it a case for condemnation,
unless he can furnish some satisfactory explanation
on the subject.

But what is the explanation? This leads us to the consideration of the affidavits. And here it is, with extreme regret, that we are called upon to declare, that we can attach no credence to them. Inerarity has forfeited his claim to the respect of this court by taking an oath to a fact which might, indeed, by possibility, have been true, but which he could not have known to be true. He has sworn that this parcel of cotton, so clearly proved to have been purchased at New Orleans, was of Spanish origin. This is a part of the machinery, an authenticating document, and its foulness communicates a taint to the residue. But his test affidavit bears, upon the face of it, another proof that he is an incautious swearer. For he testifies, with the same confidence that he does of his own claim, that the two hundred bales shipped for Platzman & Gosler were their absolute property. The testimony of some other witnesses is offered in evidence, all subject to the same objection that they swear with similar confidence, to a fact that they can know nothing of positively. These affidavits, together with several tending to discredit the testimony of Dayton, and one from Mr. Jenner, of the house of Eason, Jenner & Co., constitute all the evidence brought in upon the order for farther proof. The affidavit of Jenner goes to negative the interest in the house of Eason, Jenner & Co. It also goes to prove that his house believed Inerarity to be the sole proprietor of this shipment. But what are we to think of the discretion of this witness also, who undertakes to swear, in terms the most positive, that A. Glennie & Co. had no inte-

rest in this shipment? The case, indeed, furnishes no reason to believ they had; but on what ground can this witness undertake to deny positively a fact which, with him, could only rest on belief? In none of these affidavits is there any thing to negative the probable American interest which the evidence makes out. And can there be a pretext for contending that Inerarity could resort to no other evidence to satisfy this court of the fairness of his claim? Where is his correspondence with Milne? What was to have prevented him from showing how he bought and paid for this cotton? His accounts current with his agents or factors might have thrown great light upon this transaction. He has had ample time to do this, and the practice of the court, not less than our strong conviction that he never can vindicate his claim, must now oblige us to shut the door upon him.

The logwood must share the fate of the cotton, blended in the same claim. This we consider as the positive law of the admiralty; and although highly penal, is not without its beneficial effects in deterring neutrals from attempting frauds upon belligerent rights.[a]

---

a Vide, 2 Rob. 1. The Eenroom. Ib. 154. The Calypso. 3 Rob. 111. The Graaf Bernstorff. So, also, in the courts of municipal law it is held that property insured and warranted to be neutral, must not only have every document necessary according to treaties and the law of nations to prove its neutrality, but it must not be accompanied with any papers that compromit its neutral character. It is a maxim that neutral commerce is to be conducted with good faith towards belligerants. Their rights are to be respected as well as those of neutral nations. It is not sufficient that a part only, but the whole property covered by the policy must be neutral. And

1816.

The
St. Nicholas.

Sentence as to the ship reversed; affirmed as to the cargo, except the logwood, which was condemned.

if a cover is attempted for *enemy's* property, by an intermixture with *neutral,* it is held to subject the whole to confiscation. 1 *Caines' Rep.* 565. Blagge v. The N. Y. Ins. Co. And if the general agent of a neutral cargo covers enemy's property in the same vessel, though without the consent or knowledge of his principal, the property of his principal is condemnable, (notwithstanding it may be distinguished by the papers,) and the warranty of neutrality is not fulfilled. 2 *Binney,* 308. The Phœnix Ins. Company. v. Pratt et al.