At the present term the opinion Of the Court was delivered by
 

 Mr. Justice Story.
 

 -This cause was .heard upon the whole evidence,, introduced' by both parties, at the last term; and as'it.embraced,several points of great importance and difficulty, thé Coiirt, ex
 
 tne.ro moty,
 
 directed one of those points to be reargued ; and another, including'a final construction of the Spanish treaty in matters of deep and universal interest, was reargued upon the application of the Government itself.. The last argument was' heard at so laten period of the session, that it whs found impracticable for all 'of us-to prepare deliberate opinions, and the qause was ordered by the Court to be
 
 *66
 
 conurnied for advisement. The Court has, now coñ~e. to~-a result, which 1~üm. dfrectedto'pronc~u~ce.
 

 Whether a seizure be a droit of Admiralty, is a question entirely between the Go-yerament and the captors, with which the. claimant . has nothing to do.
 

 A preliminary questiOn was raised at.~the or~gina1 argument, .that the libel ought to be dismissed, be. cause the capture was made without public ~itb~rity, and by a non-co~imissibned vessel.. Whetber. this be so or not, we do, not `think'it matedal how .to inquire. 1i is, a-question. between' the Government and the captors, with which .il~ claimant ha nothing tQ do. . If the ship ~ñd. cargo be enemy property~. it cannot be restored to the claimant. If the ~~aptors made the capture without' an-ylega,l conupisskw~ and it is decreed good. pr'i~e, the ~x~ndemnation must, ~jnder such circurn5tances, . be. :~ `the Gpvernment, it~e1f. If with a cOmmi~sion, then it n~ay be to the captors. But in any view, the. question is matterof subsequent inqiii~r~r... aftei~ `tlke. principal question .~f prIze is, disposed of; am!: ~he Government may.; if irchooses; contest the ilght of, the' captors by a~in terlocutory apjlication after~a. decree of condemnation has passed, and `bef~re distribution is decreed The claim:ant can have no just. intekest in that ques-' tion, and camwt be perrn~ttecFto moot it before this Court.
 

 Having.dis.posed of thia point, wbich,indeecl,Iias been long ~recognised aa a ~ett~ed principle .of~the law of~pri~e, the p~th is open for the consideration of the other points of the cause.
 

 The. captors cont~end, that the whole evidence es~ táblishes, that the ship and ëargo are enemies :~~_ pefty, the property of British subjects disguised under Spanish documents, and. bound to a British port.
 
 *67
 
 That the voyage had its origin^ in London, and was to terminate there ; and that the usual frauds of false papers, false destination,, and suppression of evidence,- have been resorted to for the purpose of giving a neutral character to hostile interests.
 

 The-counsel for the claimant deny the matter of fact, and assert, that the proprietary interest of ship and cargo is
 
 bom fide
 
 Spanishand endeavour, with great ingenuity and force, to explain away the diffi'culties with which it-is admitted, on’all sides, this part of the cause is surrounded. If this , ground should: be thought not to ba éntirely and satisfactorily made out, the counsel, for the claimant farther contend, that the ship was duly documented as a Spanish ship, according to the1 stipulations Of the Spanish treaty of 1795 .; and that the effect of those stipulations is to preclude all inquiry into the proprietary interest of ship and cargo. Of the foriher, because the: passport is conclusive evidence of the national character and ownership of the ship, which all persons are estopped to deny; of the latter, because, by the treaty, free ships make free goods, and the national character of the cargo becomes wholly immaterial.
 

 To-this point, which, if settled one way, is decisive of the cause, the counsel for the captors have givén several answers. 1. That the passport of this ship was obtained by fraud, and this is aliyays in-quirable into, and vitiates all, even thé most sacred instruments and récords. 2. That the passport is not conformable to the treaty, not having been issued by royal authority, or authenticated by the royal Go
 
 *68
 
 vernment, but issued by a mere colonial Governor; and. that, such as it is, it does not state thé ship to be
 
 owned
 
 by Spanish subjects, which is indispensable under the treaty.
 
 3.
 
 That the substituted proof required by the 17th' article of the treaty, whére the passport is not regular, must be such as is subject to the thorough examination of the Prize Court. 4. That the form of the passport, referred to in the 17th article of the treaty, never having been annexed to it by the contracting parties, that article, so far as it purports to give'any effect to passports, is inoperative and imperfect, and thje imperfection cannot bé supplied by any judicial tribunal:
 

 Such aré the-leading propositions, pressed with great ability and earnestness into the discussion,.of this cause; by the respective parties. They émbrace principles of nternational law of vast importance ; they embracf private interests óf no inconsiderable magnitude ; and they' embrace the interpretation of a treaty which we are bound to observe with the most scrupulous good faith, and which our Government coüld not violate without disgrace, and which this Court could riot disregard without betraying its duty. It need not be said, therefore, that we feel the responsibility of our stations on this occasion, and that in. delivering,~our opinion tó thé world, we have pondered on it with great solicitude and deliberation, and. have looked -to consequences no farther than the sound principles of.interpretation and inter-natiprial justice required us to look.
 

 The point to which the Court will first direct its attention, is that last made, viz. whether thé 17th
 
 *69
 
 article of the treaty of 1796, so far as it réspects passports, is- inoperative and imperfect in conse- . quence of the omission to annex the. form of the passport, to the treaty. . This is a very delicate and interesting. question.
 

 The 17th article of the Spanish treaty, of 1795, so far as it respects passports, is inoperative in consequence of the omission to annex the form of passport to the treaty.
 

 . The 1.7th.article provides,.“.that in case either of the parties hereto shall he engaged, in a war, the ship's and vessels belonging to the subjects or people óf the other party, must be furnished with sea letters or. passports,
 
 (patentes de triar o pasaportes,)
 
 expressing the name, property,
 
 (propiedad,)
 
 and bulk of the ship ; as, also, the ríame and place of habitation of the .piaster or commander of the said ship, that it mhy appear thereby, that the ship really and truly belongs to the subjects of. one of the parties,
 
 which passports (dichos pasaportes) shall be ,madé out and gfanted according to the form, annexed to this, treaty.”
 
 TheA article- proceeds to declare, “ that such ships, being laden/are to be provided not only with passports, as above mentioned, buti also, with certificates contáining the several particulars of the cargo, , the place whence ,the ship sailed, that so it may be known whether any forbidden or contraband goods be on board the same; which certificates shall be made out. by the officers of the place whence the. ship sailed, in the áccústomed form ; and if any one. shall think it fit or advisable to express in the said Certificate, the • person to whom the goods on board belong, he may freely do so ;
 
 without which requisites
 
 they may be sent to óne of the ports of the other contracting party, and adjudged
 
 *70
 
 by the competent tribunal, according to what is above set forth, that all the circumstances of the above, omission, having been well examined, they shall be adjudged to be legal prizes, unless they shall give legal satisfaction of their property by testimony entirely- equivalent.” In point of fact, no form of a passport was made out and annexed to the treaty.' The case, then, now before us, is not within the
 
 letter
 
 of the treaty, for as no form is prescribed, the documents found on board cannot be compared with any form ; and until that comparison is. made, it is impossible to say whether thé stipulations originally intended by the treaty have been exactly and literally complied with or not.. There is no room here left for interpretation, on account of ambiguous language qf the parties. They have expressed themselves in the clearest manner, and it is to the passport, whose form is to be annexed to the treaty, and-to none other, that the effect intended by the treaty, whatever that may be, either as conclusive or
 
 prima fácie
 
 evidence of proprietary interest, is. attributed. Into the reasons why this form was omitted to be annexed to the treaty, we are not permitted judicially to inquire. It may have been by accident, or by design, from difference of opinion as to tvhat should be the solemnities accompanying it, or from a willingness to leave it to future negotiation. Can this Court annex a form to the treaty ? Can it supply the deficiency of the treaty, and give effect to it in the same, manner, as if no form were referred to ? Can it look to the stipulations, and décide for itself what the parties regarded as substance, and what as mere form.?
 
 *71
 
 Caa.it say that the stipulations in the text would have beén agreed to without the auxiliary form of the passport ? -.Can it decide judicially, that under no circumstances the form of the passport could be of the essence of the' stipulations ? These are grave questions, and are not to be lightly answered. They deserve and require deliberate, consideration. We have, given it; and; our opinion will now be delivered.
 

 In the first, place, this Court does pot possess any treaty-making power. That power belongs by the ' constitution-to another department of the Government and to alter,amend, or. add to any-treaty, by inserting any clause, whether small or great-, important or trivial; would be on our part an usurpa- . tion of power, and-not an exercise of judicial functions. It would be to make, and not to construe a treaty, Neither can this Court supply á
 
 casus omis-sus
 
 in a treaty, any more than in a'law. We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and haying found that, our duty, is to follow it as far as it goes, and to. stop where that stops — whatever may be the imperfections or. difficulties which it leaves behind. The parties who formed this treaty, and they .alone, have a right to annex the form of the .passport.. It is a high act of sovereignty, as high as the formation of . any other-stipulation of the treaty. It is a matter of negotiation between the ; Governments. The treaty does not leave it to the
 
 discre-tionoi
 
 either party to annex the. form of the passport; it requires it-to be the joint act of both ; and that act
 
 *72
 
 is to Tie expressed by both parties in the only manner known between independent nations — by a solemn compact through agents specially delegated, and by a formal ratification..
 

 Nor is there any thing strange or singular in leaving matters of this sort to be settled by future negotiations. In our treaty with Prussia of 1785, the 14th article contains a provision as to passports, in substance like that of the 17th article of our treaty with Spain, except that it declares that these “ passports shall be made out in good and due form, to be settled by Conventions between the parties, whenever occasion shall require.”. This stipulation manifestly contemplates that the form of the passport is to be a solemn act of the treaty-making power of both Governments, and that neither Government has authority in its. discretion to usé a form which shall be binding, without its consent, upon the other contracting party;
 

 In the next place., this Court is bound to give effect to the stipulations of the treaty in the manner and to thé extent which the parties have declared, and not otherwise. We are not at liberty to dispense with any of the conditions or requirements of the treaty, or to take away any qualification or integral part of any stipulation, upon any notion of equity or general convenience, or substantial, justice. The terms which the parties have chosen to fix, the forms which they have prescribed, and the circumstances under which they are to have operation, rest in the exclusive discretion of the contracting parties, and whether they belong to the essence or the modal
 
 *73
 
 parts of the treaty, equally give thfe rule to judicial tribunals. The same powers which have contracted, are alone competent to change or dispense with any formality. The doctrine of a performance
 
 cy pres,
 
 so just and appropriate in the civil concerns of private persons, belongs not to the solemn compacts of nations, so far as judicial tribunals are called upon to interpret or enforce them. Wé can as little dispense with forms as with substance.
 

 In the next place, we cannot admit that the annexation of the form of the passport was, in itself, (supposing we had a right to inquire into it) a matter of small moment or importance, so that the omission cotild be dispensed with, as not belonging to the
 
 substance
 
 of the treaty. It was' competent to the parties, by the particularity of the form, to have qualified the general expressions of the article, and to have made that determinate, which, upon the face of the article, stands indeterminate. It is, for instance, indeterminate upon the face of the article, whether there is to be a specification of the names of the owners of the ship, or only a general declaration that the owners are Americans or Spaniards. It has also been contended here, and is certainly susceptible of doubt, whether the passport was to express the individual ownership, or the national character of the ship. So the solemnities to be observed in granting the passport, the oaths to be made by the parties, the persons by whom they were to be verified, are all left indeterminate by the treaty. These might have been, and looking to the requisitions of other treaties, must have been explained and settled by the form annexed
 
 *74
 
 (o this treaty. The 25th article of the Dutch treaty-of 1782, is substantially the same as the 17th article of the Spanish- treaty; and the form of the passport, certificate, and sea letter annexed to that treaty, reduce to a perfect certainty ¿very circumstance which has been already mentioned. Other qualifications and limitations might have been added, in the pleasure of the parties. It is impossible, therefore, for this Court, judicially; to say what such passport might dr would have contained. We may indeed conjecture, but in this conjecture we may err; and to assert what it would be,
 
 in Uteris,
 
 would be to exercise a sovereign control over the compact itself.-
 

 Nor are the circumstances already stated, mere form; pr diplomatic ceremony. They might well have entered .into the very substance of the stipulation. The counsel for the claimant alleges,. that .the passport, intended by the treaty," was to import perfect, unimpeachable verity; that it was to have a sanctity beyond that which is granted to any other solemn instrument. Fraud would not vitiate it, nOr the most direct, unequivocal breach of good faith, or abuse of the passport,' bring its protecting virtue into question. Assuming for the purpose of argument, that this is true, the form of the passport,, and the solemnities accompanying it, were of the deepest interest' and importance to both nations. It was vital to the treaty; vital to the acknowledged rights derived under the law of nations. The immunity intended by the treaty, in this view of it, was a derogation from the general belligerent rights of both parties. They might be willing to confide the issu
 
 *75
 
 ing of such passports to the Spanish high officers of state with the royal approbation and signature, of with the corresponding signatures of our Own Secretary of State and President. They might have full faith and confidence, that under such guards, the danger of abuses would be very much diminished,.if not entirely Checked. But they might, not be willing to trust to the integrity, discretion, and watchfulness of subordinate agents.; to officers of the customs; to colonial Governors, or commanders in distant Provinces. In point of fact, our own.passports have issued under the authority and signatures of our highest executive officers. What reason has this' Court to presume that our Government would accept of a verification by inferior officers of Spain ? What reason has this Court to presume, that our Government would have been satisfied with a passport signed by a' colonial Governor for want of royal passports ? It has not been so stipulated in the treaty. It has not, in terms, dispensed with the annexation of the form of the passport to the treaty. Even if one Government had been willing to dispense with it, it remains to be shown, that the other was also willing. And if both were willing, it would still remain to be shown, that the act of dispensation was consummated by a solemn renunciation; for the obligations of the treaty could not be changed or varied but by the same formalities with which they were introduced ; or at least by some act of as high an import, and of as unequivocal an authority. All . that can be said in the present case, is, that the subject of the annexation of the passport was taken
 
 ad
 
 
 *76
 

 referendum
 
 by the parties. They had competent authority so to do: and this Court is bound to presume, that they nad good reasons for their conduct. It is far more consistent with every fair interpretation of the acts of the Government, to suppose,, that the form of the passport was postponed with a view to the suspension of the article until the subject was more deliberately considered, or could be more conveniently attended to, than to suppose that words of reference were, used without meaning, and forms carrying with them such. important and interesting solemnities, ¿nd such obligatory force and dignity, were hastily abandoned at the very moment they were studiously sealed to the text. Unless this Court is prepared to say, that all forms and solemnities were useless and immaterial; that neither Government had a right to insist upon a form after having assented to the terms of the article ; that a judicial tribunal may dispense with what its own notions of equity may deem unimportant in a treaty, though the .parties have chosen to require it; it cannot consider the 17th article of this treaty as complete or operative, until the form of the passport is incorporated into it by the joint act of both Governments.
 

 Upon the whole, it is the opinion of the Court, in which opinion six judges agree, that (he form of the passport not having been annexed to the ,17th article of the treaty, the immunity, whatever it was, intended'by that article, never took effect; and therefore, in examining and deciding on the case before us, we must be governed by the general law of prize.
 

 
 *77
 
 The onus probandz 18 Ofl the c'aimant'.
 

 • This view of the case renders it unñece~sary to consider the other points, made by the counsel for tJ~e captors,. as to the effect of `the treaty; and we therefore give no opinion upon theme
 

 It. remains then to' consider whethe~ ~the ship and caigo, now in judgment, are, in fact, neutral or hostile property. The pacts are ~xt'remely complicated, and the evidence, in `maiiy instances, clashes so as to forbid all `hopes of reconciling it. It eannot be disguised too, that the, claim is involved in much perplexity,. and . is. shaded by some circumstances that have not been entirely cleared away. If it were not a task ~from which we could derive no general instruction',~ the whole evidence might be minutely éx-amined, as to the questions of false destination, suppression of papers, and use of false papers. But the labour• would be~ very great, and after all, would .conduce to no. important purpose. We shall content ourselves, therefore, with a brief statement of the result of our opinion.
 

 • It is th. be recollected, that by the settled rule of Prize Courts, the onus probandi of a neutral interest rests on the claimant. This rule is tempered by another, whose liberality will not be denied, that the evidence to acquit or condemn, shall, in the first instance, come from the ship~s papers, and persons on board; `and where these are not satisfactory, if the claimant has not violated good faith, he shall be admitted to maintain his `claim by farther proof. But if, in the event, after full time and opportunity to aduce proofs, the claim is still left in uncertainty, un~ the neutrality of .the property is not establishè4
 
 *78
 
 beyond reasonable doubt, it is the invariable rule of Prize Courts to reject the claim, and to decree con? demnation of the property. There is another rule too, founded in the most salutary and benign principles of justice, that the assertion of a false claim, in whole, or in part, by an agent of, or in connivance' with the real owners, is a substantive cause of forfeiture, leading to condemnation of the property. These principles are not alluded to in this case, for the purpose of founding our present judgment upon them; for we do not rely upon it as a case, merely of reasonable doubt; but to show that a case less strong might justly have supported the decree, we feel ourselves bound to pronounce — i-of condemnation.
 

 A false claim is a substantive 'cause of condemnation.
 

 Determination of the question of proprietary interest in this case.
 

 We cannot resist the conclusion, looking to the whole evidence* that this is a case whete. the whole mercantile adventure had its origin, in the house of trade of Messrs. Von Harten and Gobel, a. house domiciled in .London. The ship was, beyond all question, a foreign ship; but of what nation, and in whose ownership .at the time when she acquired her ostensible Spanish character, is studiously concealed. She came just before her naturalization' from New Providence; and that naturalization.was procured, as we feel ourselves constrained to believe* by an imposition practised upon the Spanish judicial authorities, by nieans of a ■ pretended lien under a bottomry' bond, supposed to be given for repairs. The holder of the bond procured a judicial sale of the vessel, became himself the purchaser; and after-wards obtained the Spanish character by a nego-. tiation with the Spanish Colonial Government,
 
 *79
 
 making awkward apologies for his asserted igno-raúce of the former ownership, and endeavouring tQ allay the well-founded distrust of tpat Govern-meat. -' To this very hour the. claimant has observed a profound silence on this point, a source of j ust and pregnant suspicion* although he has loaded the cáuse with documentary proofs and affidavits on other points. He has not chosen to give any information as to the origin of the bottomry bond, or former ownership* of the vessel, or of the circumstances under which the supposed lien was acquired. Yet these facts would seem to Jbave lain immediately within; his reach. On board, too, of the vessel: at the time, pf the capture, was the special and confidential agent of Messrs. Von Harten and Gobel, and also the brother-in-law-of Mr. Von Harten. Some papers were .thrown over .board, others were concealed,’ anct others spoliated.. The testimony of the witnesses lipón the standing interrogatories, was fat from satisfactory j and it is extremely difficult to exempt the agents on board the vessel from the impu* tation of designed suppression of facts and prevarication; .The claimant, Mr. Munos, is the father-in* law*of Mr. Gobel,' and claims this very valuable shipment as his own property, asserting himself to be a merchant now engaged in business. And yet it is proved by a weight of testimony- that seems difficult to resist^ that Mr. Munos has not been known to be engaged in commercial business on his own account for at least, fifteen years before the time of this shipment. And it is established in the most satisfactory manner,, and is indeed admitted by the claimant him
 
 *80
 
 self, that on account of the foreign character of Mr< (the- son-in-law of Mr. Munos,) all the foreign business of Mr. Gobel has been constantly carried on for several years under the cover of Mr. Munos. These are a few of the extraordinary facts of this case, and combining them' with the .indications of the papers found on board* and the suppressed documents which have reached the light; the vehement presumption, and almost written proof, that Mr. Gobel, the admitted partner of the English hoUse of Von Harten arid Gobel, was the stationed ageift of that house at the Havana ; arid the fact, that the destination was alternative^ or double, to London or Hamburg, or both; the conclusion is difficult to overcome, that the cargo was the property of Messrs. Von Harten and Gobel, or some other unknown enemy proprietor, and covered by the Spanish cha-taeter of Mr. Mtínos. And the Court is cónstrain- . ed to consider the proceeding at the. Havana as mere machinery to naturalize an enemy’s ship, and that the ship,, either previously belonged to Messrs. Vori Hárten and Gobel, dr some other enemy proprietor, or was purchased at New-Providence on his or theif account.. It is perfectly immaterial whether Mr. Munos had any subordinate interest in the "ship and cargo or not. If his claim be substantially false iri the manner in which it is framed, having been adopted by him, he has justly incurred a forfeiture of any such interest, by attempting an imposition upon the Prize Court.
 

 It is the judgment of the Court, that the decree of the Circuit Court, condemning the ship and cargo.
 
 *81
 
 he affirmed, with costs. From so^much of this opinion as respects the question of
 
 proprietary
 
 -interest of vessel and cargo, three Judges dissent.
 

 Mr. Justice Johnson.
 

 This is an appeal from the sentence of the Circuit Court of North Carolina, condemning this vessel and cargo as prize of war to tfie Roger privateer.
 

 The condemnation below appears to have proceeded on evidence of an hostile interest existing in . the ship. For, as to the cargo, it is not denied that the proprietary interest is immaterial; since, if the ship. be Spanish, the existence of an enemy interest in the cargo, does not affect it. Yet, much of the evidence and argument have been introduced to-prove the existence of ap' hostile interest in the cargo ; but it has been with a view to maintain two positions : 1st. That it is a strong circumstance to prove the vessel to be British property; and, 2d. That, though it be not enemy owned, yet, as both -vessel and carga are claimed by the neutral, if it be proved that he has attempted a fraud, the penal consequence is the forfeiture of his own interest.
 

 . It cannot be denied, that there are many circumstances in the case, going strongly to prove too intimate a connection, between this adventure, and the., mercantile transactions of the house of Gobel, consisting of Gobel and ,Von Harten, a British merchant,. Nor is it entirely clear that Rahlives, who appears in the machinery as supercargo, is not himself a participator in interest. If I felt myself now called upon td decide this case on the ordinary prin?
 
 *82
 
 ciples which govern the decisions of Prize Courts, on neutral claims; it must be acknowledged, that . , , . . , . . , . , . ' , there is a good deal of evidence which must be rejected, in order to clear it from the tissue of difficulties in which the circumstances • involve it. Yet there is one important consideration which rides over all the unaccountable combination» Of interest which present themselves to the view of the Court Why should British property oh board a.Spanish vessel have been disguised as Spanish ?J There aré obvious reasons why -Spanish property should have been disguised' as British ; for, it would have afforded protection against the only enemy a Spaniard had to fear — the patriot privateer. But, as England was at pee ;e with ail the world except America, and enemy property secure from American capture in a Spanish vessel-, it is difficult to conceive a reason why this disguise should have been thrown over ;a British cargo. The course,, however, which 1 will pursue in coming to a conclusion, precludes the necessity of disentangling the web, in which the interest» of the claimant are wound up by the various circumstances'of the destruction, mutilation, and concealment of papers, and the questionable shape in which several of the actors in the drama present themselves to the view of this Court.
 

 The claimant founds his right to restitution, on his Spanish character, and the sufficiency of his Spanish documents under the treaty. The captor contends', that the documents found on board, wrere not of the first order under the treaty, and that when let in to
 
 *83
 
 thé. production of substitutes, a plenary inquiry is opened into proprietáry interest.
 

 _Before' entering upon these'more general questions, it is necessary to take notice of a preliminary ground of condemnation, which, if it can be sustained, anticipates every other inquiry. It appears, that the vessel left the Havana under convoy of a British frigate, and, it is contended that this circumstance is,
 
 per se}
 
 a ground of condemnation.
 

 This is, at least, a new ground in this Court; and it cannot be expected that it will meet with á very favourable admission from-a Court which has manifested no disposition to multiply causes of condemnation. Without being supposed to express any inclination to adopt the principle, I deem it sufficient to remark, that if it could be admitted, it ought not to be applied to a nation which needed that protec-, tion, against an existing and enterprising enemy"; and' which ought, therefore, to: -be considered, as having sought it for that purpose, and not against a neutral, whose principles of conduct it had then no reason to distrust. The Gulph of Florida, at that time, sWarined-with patriot privateers; and the convoying ship had, moreover, parted, from the fleet before this capture was made. Thé conduct of this véssel was perfectly pacific whep overhauled by the American cruiser. The utmost to which the Courts of Great Britain have gone, has been to affect the merchant vessel actually taken under convoy, with the resistance or character of the convoying ship ; and when such a case shall occur, it will be time enough for this Court to determine on the course it
 
 *84
 
 will adopt. ■ At present í feél iii> inclination to go so much beyond those decisions as . has been here corn-tended for. -
 

 On- the principal question, it appears, thatthis vessel was provided, at the time of her sailing,' both with
 
 a
 
 passport and certificate of her cargó. ' That these papers were, ón board at the time of .thecap-ture, cannot be doubted ; they were both delivered by the captain to the Registrar of the District Court* the former marked 'A. No. 7; the latter, B. Nó. 1, Some doubt arises whether they were both exhibited prior to the capture ; but this is wholly; immaterial, in the question of condemnation.
 

 In behalf of the claimant it is contended, that on the production of the passport and certificate, or bill of lading of the cargo, he is entitled.to restitution. To this the captor objects, that the Í 7th article of the. treaty with Spain, contemplated a forto of passport intended to be attached to .that.treaty; that as-no such form was settled by the two nations,,the claim must rest altogether upon the provisions of the loth artic e, and the..proprietary interest is to be-inquired into as in ordinary cases. But, if the contracting parties are to be permitted to devise forms of passports for themselves severally, then that this is not a passport in the language of the treaty, but a substitute for one, and is defective in not .expressing unequivocally that the ship was Spanish property.
 

 On this part of the casé it is proper to remark, that it is not always easy for the criticising eye df the common law, to expand to the enlarged views and
 
 *85
 
 ¡remóte perceptions which should govern the mind in the construction of treaties. Yet nothing could be
 
 . i .
 
 ... more inconsistent with international law,, than to apply to such instruments those scrutinising principles, which enter into the construction of a special plea or a criminal statute. From history, analogy, and policy,, as well ns language, are tó be gathered the view's of the contracting parties; and however either may be. pressed by the application of conventional stipulations to particular cases, or . under particular -circumstances; . not less is the obligation to execute them in a spirit, not only of good faith, but of liberality. . Where no coercive .power exists for compel-lingthe observance of contracts but the force of arms, ..honour, and liberality are the only bonds of union between the contracting parties, and all mitior considerations are to be sacrificed to the great interests of ¡mankind.
 

 In the cáse before us, I see no reason for nullifying the operation of the 17th article, for want of the form which was in contemplation to.be drawn up find attached to? the .treaty.: The substance of the passport intended to. be prescribed, is so copiously exhibited, ás to render it a matter of the simplest effort to throw it/irtto form. This, no doubt, was tfad cause why. the contracting parties manifested • so müch ¡indifference about carrying their intention; into - effect. I am-, therefore, content to give the same effect to any instrument complying substantially with thiá article, as ought to have been given1 to a passport in a prescribed form. What is that effect ?
 

 
 *86
 
 This is easily ascertained by comparing the provisions of the 15th, 17th, and 18th articles. By the 15th, the principle is established, that free ships shall make free goods, and that several branches of commerce which the modern law of nations has prohibited to neutrals, shall notwithstanding be freely prosecuted. But, knowing the endless litigation which questions of proprietary interest give rise to, and the sad depravity of morals exhibited by witnesses in Prize Courts, the enlightened statesmen who formed that treaty, resolved, by the 17th and 18th articles, to make the freedom of the ship to rest upon documentary evidence in the first instance, and evidence of property in those cases only, in which the vessel was unprovided with the necessary documents; that each natibn should be sovereign to judge for itself in conferring upon its own vessels the immunity secured by the treaty, and that the acknowledged right of adjudication in the Courts of the capturing power, should be superseded, when a vessel was found on the ocean provided with the' documentary evidence stipulated for by treaty ; and only révert, when the vessel, being unprovided with such documents, was obliged to resort to evidence of property of a less solemn nature.
 

 It is contended, that this is yielding an important national right. What if it is ? It is a mutual relinquishment, and one madé by the Government, not by this Court. And although it operate against us now, the time may come when the comity of Spain, or her colonies, may extend the benefits of it to the commerce of this country. But, be that as it may,
 
 *87
 
 if the relinquishment7has been made, it is incumbent on. us to observe it.! And although it may not be so sensibly felt at present, the time is scarce gone by when it was thought a highly beneficial stipulation to this country. Spain was, at the date of that tréaty, a respectable naval power. Her relations With Europe and the Barbary powers, often involved her in wars. America abounded with ships and seamen, and her prospects were favourable for the enjoyment of peace. To carry on the commerce of the West-indies and Mediterranean, as the favour-ite carriers of belligerent cargoes, was, therefore, to us, a highly flattering object. And though occasional impositions might be practised, it was, comparatively, a trivial consideration, and the chances mutual. When abuses should become flagrant and intolerable, it would have presented a just cause for dissolving the treaty; but it does not rest with Courts of justice to dissolve a treaty.
 

 As to considerations drawn from the impolicy of discouraging the spirit of cruizing, 1 attach to them very little importance. The most serious doubts may well be entertained of the policy of giving encouragement to that species of enterprise. Certain it is, that no nation can pursue it long without feeling its demoralizing influence. It draws together a race of men, from every quarter, who want for nothing but a legal pretext for indulging their appetite for blood and violence; and while their habits and examples become popular, the rapid fortunes which are occasionally acquired, render the most valuable classes of a community dissatisfied with seeking
 
 *88
 
 competence by the slow progress of useful labour. It will not, perhaps, be too much to say, that this country is, at this time, experiencing something or the baneful effects which flow to the world from letting loose the passions of men to gratify themselves with plunder. But, be this as it may, it is the direct object of these articles, of this treaty, to cover commerce from capture; and if a treaty is to be construed with a view to effectuate its intent, that construction which will afford the most ample protection to commerce, will be most consistent with the views which dictated this treaty. Could the language of the treaty leave a doubt on this, subject, it is historically known, that the policy of the United States, át the time of its date, was, if possible, to annihilate the right of cruizing against commerce. With many ships, and a most flourishing trade, she had not a vessel .of war and while every other nation was likely to be embroiled in wars, her policy' was peace, and her prospects favourable to the enjoyment of it. To become the carriers of the world, was the object to which her negotiations were directed; ‘and could she have obtained the same stipulation from all ihe -rest of the European nations, she must have succeeded greatly.
 

 The example of other nations in the construction of treaties' is brought to the notice of this Court. But, besides that the analogy in the cases, referred to is very remote, I cannot admit the force of any example that contravenes general principles. It is a melancholy truth, that nations and their Courts are too often inclined to restrict or enlarge construction,
 
 *89
 
 under a temporizing policy suggested by the pressure or allurement of present circumstances. I will endeavour to give this treaty the same construction against an American captor, as ought to be given it in the Courts of the opposite contracting party. And the day may arrive when American commerce will have no cause to regret that our Courts have pursued liberal and enlarged views in adopting this construction.
 

 On the exceptions taken to the form of the passport it is to be observed, that on the face of the instrument it is declared to be issued in default of royal passports. From this circumstance, a doubt arose whether it was an instrument of the highest authority. This led to an inquiry at the highest sources of information relative to the powers of the Governor of Cuba to issue such passports. From the information thus obtained, 1 am satisfied that his powers are amply sufficient to support the authority of that document. Some very serious doubts also have been raised relative to the form of the instrument, particularly that passage of it which has relation to the national character of the ship. The treaty^ requires that it should set forth
 
 the name, property, and, hulk of the ship; also, the name and habitation of the
 
 master,
 
 or commander.
 
 These requisites are all minutely complied with, unless we except that part which relates to the property of the vessel. The words used with that view are simply
 
 fragata mer-cante Española;
 
 and a doubt has existed whether this be a sufficient affirmance of the property or national character of the vessel. Nor has this doubt
 
 *90
 
 been removed without a careful reference to the passports of various nations. The result is, that in all of them the affirmancé is general, without specifying the individual proprietor. It is also in evidence that this is the form known and used in Spain and her colonies, as the passport of regularly documented and acknowledged Spanish vessels; and I feel myself bound to receive aud acknowledge it as sufficient in form and substance.
 

 Thus far the opinion was written, and prepared to be delivered, prior to the argument ordered at the instance of the Executive. I have seen no reason to change a word of it, from any thing since heard. On the contrary, the last argument has fully confirmed me in its correctness. Thousands of imaginary cases of fraud and collusion, have been suggested to alarm the Court; and it may be, that our Government, having now a prospect of becoming a respectable naval power, and having experienced the activity and enterprize of our privateers in the late war, may feel less disposed to promote the principles of the armed neutrality, than they did formerly. This conviction of former error has generally grown out of the same change of circumstances in other states. But it is not through the medium of Courts of justice that this change of sentiment is to develope itself. If this treaty was ever binding, it is equally binding now ; apd in adjudicating between individuals, the same rules which would ever have been applicable, ought to be religiously adhered to, under all possible changes of interest or policy.
 

 But the interests and apprehensions so eloquently
 
 *91
 
 pressed upon the notice of. this Court are not real. They are factitious ; and may have their effect on a client’s cause, but they are not, the well understood interest, or the well founded apprehensions of the Government. The execution of one treaty in a spirit of liberality and good faith, is a higher interest than all the predatory claims of a fleet of privateers.
 

 What, hás this country to fear ? A practical answer is always'most satisfactory on such a question; with similar, treaties existing with Various other powers;, what real injury was sustained in the late war ? The truth is, and every one conversant in national policy well knows, that there is always less danger of imposition in reality than a limited view of the operation of such a stipulation would suggest. It is not the interest of the belligerent to foster the carrying trade of a commercial rival; hence, Great Britain would rather, intime of war,.compel her own vessels to sail under convoy, than permit her merchants to use a neutral bottom. Nations are generally jealous of permitting foreigners to hold domestic tonnage, or use domestic names. There are, commonly, privileges of trade attached to the ship’s ■character, and severe laws enacted against a practice which is always viewed as a fraud upon the Government whose flag is thus acquired. Witness the severity of our own laws in such cases.
 

 / If there is any nation in the world more interested than all others in the liberal support of the doctrine contended for by this claimant, it is the United States. Our chances of enjoying peace , are much geater than any other } and if. there be a.tendency
 
 *92
 
 to war, it is with a nation which will not be driven to necessity of making use of neutral bottoms. I cannot, therefore, really see why our administra* tion should have - been so seriously alarmed at the prospect of our deciding in favour of this Spaniard, as has been urged upon this Court.
 

 But, considerations, of policy, or the views of the administration, are wholly out of the question in this Court.. What is. the just construction of the treaty is the only question here. And whether it chime in with the views, of the Government or not, this individual is entitled to the benefit of that construction.
 

 The more I have examined this subject, the more thoroughly I have been convinced that my view of the construction of the treaty is the correct, one, viz. that, national protection was to depend upon authentic documents, and not proprietary interest; or more correctly, that each nation should be. restricted from looking beyond those documents. There is. one provision contained in all these treaties, which sets this point, in my opinion, beyond all doubt. Which is, that, in the case of convoy, the word of the commander of the convoying ship is to be taken conclusively for the neutral character of every vessel in the fleet. This is the substitute in the case of a fleet for the passport of a single vessel. I speak of authentic documents; for the absurdity never was imagined that a passport stolen or seized by violence^ was to have the force of one regularly issued.
 

 But it is contended, that it is due to Spain to pursue these inquiries into proprietary interest, and due. to the peace of both nations that such questions
 
 *93
 
 should jbe. examined in. Courts of justice, rather than leave them to be the subjects of diplomatic remonstrance. TJiis is a specious, but very unsound argu-Gí)ént.:v Have not the vexations of Courts of Vice-Admiralty, and .the violence of armed cruisers, been the pregnant sources of half the commercial altercations of the last , century ? This. ivas, the evil intended to be remedied, and whatever impositions might flow from the remedy, it was well understood, that the benefits of a commerce uninterrupted by the cupidity of cruizing vessels, would more than compensate. There is. one consideration, which, on this subject, is conclusive. No Sovereign can appear in Courts of justice to defend his subjects, and it was, therefore, that; a method was devised for taking such questions from Courts of justice if possible, and referring them to another tribunal. Every stipulation in the treaties of that day, teems with the project of ridding commerce of vexatious capture, and mqre vexatious litigation, A better practical-illustration of the wisdom of such a measure cannot be imagined than that which the present case presents.
 

 But it has been earnestly and successfully contended, that if such was the intention of the treaty, it must fail altogether for want of the form of a passport, contemplated in the 17th article.
 

 Yet if there is any one question more clear of doubt than all others, I think it is this. For the fallacy of the.proposition admits almost of mathematical demonstration. This otnission must have been the result of either accident or design; It may have
 
 *94
 
 proceeded from accident betweén the negotiators in Europe ; but after the receipt of the treaty, and its submission to the Cabinet and the Senate here, the omission could not have been the result of accident when it received the sanction of.oiir government. It must then have been designedly omitted by our constituted authorities. And for what purpose ? Will any one presume to suggest that it was a deliberate fraud upon the other Government? calculated to leave our Courts at liberty, on some subsequent day, to declare the 17th and 18th articles in effect void? Did we hold out to them the idea of having adopted the provisions of those articles into our national code, when we were conscious that they contained an innate vice, calculated to defeat every beneficial effect? If the argument, on this point could meet the sanction of our Government, I would blush for it. From the advocate of a captor, it might have been expect-, ed ; but cannot lay claim to the sanction or counte-, nance of the American Government. I am sensible that the cabinet would disavow such a doctrine.
 

 But, it is urged with much emphasis, that we have no right to annex a form, or to add a clause to the treaty. It is not contended that we have. No member of this bench entertains such a thought. But why may not the contracting parties supply one ?- All the requisites being prescribed in language, the form and the substance are the same thiiig. If the contract is complied with, what matters form ? Whether it is substantially complied with or not,must be a question for the Courts of the , contracting parties. But hojy ridiculous would it be, to be try
 
 *95
 
 ing form, and shape, and size, like the ignorant Arab, where the treaty is substantially complied with. Had it merely stipulated, that a passport, in a form prescribed, should be given mutually, there would have been something in the argument; but in expressing with precision the substance of the instrument to be given, it ..renders the devising of a form a mere work of supererogation. If no other conclusion is to be drawn from its omission, certainly this may, that it was too trivial to .be remembered.
 

 In order to support the argument, that the absence of the form nullifies the 17th and 18th articles of this treaty, the attention of this Court has been drawn to the provisions, of the 14th article of the treaty with Prussia. And it has been contended, that until a form of a passport be adjusted between the two nations, that article is also a dead letter. The construction is one which could not be supported even on a common law instrument. The words are, “ which passports shall be made out in good and due forms, (to be settled by conventions between the parties whenever occasion shall require.)” If the Spanish treaty is to be construed by analogy to this, the argument is directly on. the other side. For these words, obviously leave “ the good and due forms” of these instruments to be devised by the parties severally, and only stipulate for settling a form by convention,
 
 “ whenever occasion shall require
 
 that is, whenever either shall be dissatisfied with the form used by the other. The nations which, in the very same article, could repose such implicit faith in each other’s candour, as to leave the neutrality of
 
 *96
 
 whole fleets to be determined on the word of the convoying officer, merit more the confidence of each other, Jthan to have imputed to them an evasion so obvious.
 

 As it,became indispensable to assign some reason for retaining these two articles in the treaty, if they were to. be held a dead letter for want of the form, it has been suggested, that the only operation intended by them was to prescribe a law to the caprice or violence of cruisers, and subject them to more exemplary punishment than in ordinary cases.
 

 Ño one who reads and compares these four articles, the 15th, 16th, 1 7th,. and 18th, and considers the historical events in which they , originated, can for a moment suppose, that this was the object which led to the insertion of the two latter of those articles. The intention Was to ingraft into the-law of nations a great and a hew principle. And although power and cupidity may affect to sneer at it, and melancholy experience cannot dismiss the apprehension, that it is too etherial to subsist in this nether atmosphere, yet it is one which philanthropy will ever cling to, and justice cherish. To ingraft into this treaty thé principles of the armed neutrality was the object, and for this purpose the 15th article declares those principles in detail. The 16th furnishes the exceptions to them ; the 17th prescribes the evidence on which those privileges shall be. conceded : and the 18th, after regulating the conduct of cruisers towards vessels so protected, proceeds to declare, that “ the ship, when she shall have showed such passport, shall be free, and at liberty
 
 *97
 
 to pursue her voyage, so, as it shall not be lawful to molest or give her chase, in any manner, or force her to quit her intended course.” It is impossible .for language to be ¡stronger. That the violation of these stipulated privileges, would aggravate the punish- . menf to be inflicted on cruisers, is a consequence of the thing provided for. not the thing, itself.
 

 March
 
 6th.
 

 Mr.
 
 Harper,
 
 for the claimant and appellant,
 

 moved to vacate the decree ot conciemnation entered in this cause,, and that it should be again continued 'to the. next term in order to enable the claimant to procure farther .proof as to. the annexation of forms, of passports to the. original Spanish treaty, and read an affidavit annexed to a printed copy of .the treaty, published'at the royal printing-office ih Madrid,: which, contained |wo forms of passport,; which will be found in the margin.
 
 a
 

 . Upon the whole, I am decidedly of opinion that the claimant is entitled to restitution. Nor should I find much difficulty in supporting his right on the ground of proprietary interest. But entertaining the opinion1 that I db, on this preliminary point, there is nonnecessity to examine, into this part of the case.
 

 Sentence affirmed.
 

 
 *98
 
 The motion was opposed by the
 
 Attorney- General
 
 and Mr.
 
 Wheaton,
 
 for the caiptors and respondents.. *
 

 
 *99
 
 Mr. Justice Story.
 

 Without giving any opinion upon the sufficiency of the evidence, to establish the
 
 *100
 
 probability, that the forms of passport now offered t0 inspection of the Court were ever authorita-
 
 *101
 
 lively annexed to the original treaty, in the possession of the Spanish Government, the Court is . of opinion, that - the motion for a continuance must be denied. The passport found on board the Isabella* is materially variant, both in form and substance, from the forms of passport now produced; and to tha form bf the passport actually annexed to the treaty, and to no other, was the effect intended by the treaty, whatever that effect may be, meant to be attributed. The possession of that form, and not of any other passport which might be substituted for it, was of the very essence of the treaty. It is clear, therefore, that even if the case were as the claimant’s counsel supposes, he could derive no benefit whatever from it, because the treaty passport was not on board ; and the case must, therefore, in this Tespect, be judged by the rules of the Prize Court, independent of the conventional law.
 

 Motion denied.
 

 The St. Nicholas, 1
 
 Wheat. Rep.
 
 417. The Vrow Judith, 1
 
 Rob.
 
 150. The Baltic, 1
 
 Acton,
 
 14. 2
 
 Binney,
 
 308. 15
 
 East’s Rep.
 
 78.
 

 a
 

 For the provisions of this treaty, see Appendix, Note Ño. III.