EDWARD CARRINGTON AND OTHERS v. THE MERCHANTS' IN-
SURANCE COMPANY.

498

The case was argued by Mr Binney and Mr Sergeant, for

the plaintiffs; and by Mr Franklin Dexter and Mr Webster, for the defendants.

Mr Binney, for the plaintiffs,

502

506

508

Mʀ Franklin Dexter, for the defendants.

510

Mr Webster, for the defendants,

512

Mr Sergeant, in reply,

516

Mr Justice STORY delivered the opinion of the Court.

After stating the case he proceeded :

This cause comes before the court upon a certificate of a division of opinion of the judges of the circuit court for the district of Massachusetts.

Upon the trial of the cause upon the evidence, the parties propounded certain questions, upon which the circuit court (with the assent of the parties), certified a division of opinion, for the purpose of obtaining the final decision of this court in regard to them.

The first is, whether a seizure and detention, to come within the exception of the policy relating to contraband and illicit trade, must be for a legal and justifiable cause. The question here propounded is not whether there must be a legal or justifiable cause for condemnation ; but simply, whether there must not be such cause for the seizure and detention. And we are of opinion, that the question ought to be answered in the affirmative. The language of the exception, when properly construed, leads to this conclusion ; and it is confirmed by authorities standing upon analogous clauses. The language is, " the assurers shall not be liable for any charge, damage or loss which may arise in consequence of seizure or detention for or on account of illicit trade, or trade in articles contraband of war." It is not, then, every seizure or detention which is excepted ; but such only as is made for, and on account of a particular trade. A seizure or detention, which is a mere act of lawless violence, wholly unconnected with any supposed illicit or contraband trade, is not within the terms or spirit of the exception. And as little is a seizure or detention not bona fide made upon a just suspicion of illicit or contraband trade, but the latter used as a mere pretext or colour for an act of lawless violence ; for under such circumstances, it can in no just sense be said to be made for or on account of such trade.

It is a mere fraud to cover a wanton trespass; a pretence and not a cause for the tort. To bring a case, then, within the exception, the seizure or detention must be bona fide, and upon a reasonable ground. If there has not been an actual illicit or contraband trade, there must at least be a well founded suspicion of it, a probable cause to impute guilt, and justify further proceedings and inquiries; and this is what the law deems a legal and justifiable cause for the seizure or detention. The general words of the policy cover the risks of restraints and detainments of all kings, princes and people. The exception withdraws from it such as are bona fide made for, and on account of illicit or contraband trade. So that, upon the mere terms of the exception, there would not seem any real ground for doubt. But if there were, the next succeeding clause associated with it, demonstrates that such must have been the understanding of the parties. It is there said, that the judgment of a foreign consular or colonial court shall not be conclusive upon the parties as to the fact of there having been articles contraband of war on board, or as to the fact of an attempt to trade in violation of the laws of nations. Now, if a mere lawless seizure or detention, under the pretext of illicit and contraband trade, were within the exception; the inquiry, whether there had been contraband articles on board, or an attempt of illicit trade, would be in most, if not in all cases wholly unimportant and nugatory to the assured, for whose benefit the clause is introduced; since the sentence would always establish a pretence for the seizure and detention, although not a justifiable cause for it. The reasonable interpretation of the clause must be, that it was introduced to enable the assured to disprove the existence of justifiable cause for the seizure or detention, by showing that the facts did not warrant it.

We think that the authorities cited at the bar, lead to the same conclusion. In Church v. Hubbard, 2 Cranch 187, 2 Cond. Rep. 385; where the exception was, "that the insurers do not take the risk of illicit trade with the Portuguese, and the insurers are not liable for seizure by the Portuguese for illicit trade;" the main question was, whether an attempt to trade, not consummated by actual trading, was within the exception. The court held that it was. On that occasion the chief justice said, " no seizure, not justifiable under the laws and regulations established by the crown of Portugal for the

restriction of foreign commerce with its dependencies, can come within this part of the contract; and every seizure which is justifiable by those laws and regulations must be deemed within it." And applying this language to the circumstances of the present case, we may add, that no seizure or detention not justifiable by the law of nations can come within the present exception, and every seizure which is justifiable by the law of nations, must be deemed within it. The cases of Smith v. The Delaware Insurance Company, 3 Serg. and Rawle 74; and Faudel v. The Phœnix Insurance Company, 4 Serg. and Rawle 29; Johnston and Weir v. Ludlow, 1 Caines's Cas. in Error 29; S. C. 2 Johns. Cas. 481,(a) adopt a similar doctrine, if they do not proceed beyond it. The case of Higginson v. Pomroy, 11 Mass. R. 104, contained an exception of "illicit trade with the Spaniards;" and the court held, that the exception extended to every seizure and detention suggested by the prohibitions of trade and intercourse, as the means of enforcing them; and whether of prevention or of punishment for infraction; and that, therefore, it extended to cases where the charge of illicit trade with the Spaniards might be ultimately repelled; and where the property seized might be in consequence acquitted under the circumstances of the particular case. But this supposes that there was probable or justifiable cause for the seizure, bona fide existing; and the court explicitly assented to the general doctrine in Church v. Hubbard. It is true, that the learned chief justice, in delivering the opinion of the court, added, that "*perhaps* (we may add), although not necessary to the present decision, even arbitrary acts of the Spanish colonial governments, if assumed to be justified on their parts by the prohibitions of trade and intercourse, are, we think, within the exception of seizure for illicit trade." This is professedly a mere dictum of the court; and giving it every reasonable force as authority, it proceeds on the supposition that such arbitrary acts are bona fide done, and are not mere pretexts to cover an illegal seizure.

The second question is, whether, assuming the other facts to be as stated and alleged above, and taking the authority of the seizing vessel to be such as the plaintiffs allege (that is to say, of an armed vessel fitted out and commissioned at Callao

(a) See also Laing v. United Insurance Company, 2 Johns. Cas. 174; S. C. 2 Johns. Cas. 487; Tucker v. Juhel, 1 Johns. R. 20.

by Rodil), there was a legal and justifiable cause for the seizure of the General Carrington and her cargo. The third is precisely the same in terms, except taking the authority of the armed vessel to be such as the defendants allege (that is to say, to be an armed vessel sailing under the royal Spanish flag, and acting by the royal authority of Spain).

Both these questions present the same general point, whether there was, under the circumstances of the case, a legal and justifiable cause for the seizure and detention of the ship and her cargo. The facts material to be taken into consideration in ascertaining this point are, that the ship, when seized, had not landed all her outward cargo, but was still in the progress of the outward voyage originally designated by the owners; that she sailed on that voyage from Providence with contraband articles on board, belonging, with the other parts of the cargo, to the owners of the ship; with a false destination and false papers, which yet accompanied the vessel; that the contraband articles had been landed, before the policy, which is a policy on time, designating no particular voyage, had attached; that the underwriters, though taking no risks within the exception, were not ignorant of the nature and objects of the voyage; and that the alleged cause of the seizure and detention was, the trade in articles contraband of war by the landing of the powder and muskets already mentioned.

If by the principles of the law of nations there existed under these circumstances, a right to seize and detain the ship and her remaining cargo, and to subject them to adjudication for a supposed forfeiture, notwithstanding the prior deposit of the contraband goods; then the questions must be answered in the affirmative, that there was a legal and justifiable cause.

According to the modern law of nations, for there has been some relaxation in practice from the strictness of the ancient rules, the carriage of contraband goods to the enemy, subjects them, if captured, in delicto, to the penalty of confiscation; but the vessel and the remaining cargo, if they do not belong to the owner of the contraband goods, are not subject to the same penalty. The penalty is applied to the latter, only when there has been some actual co-operation, on their part, in a meditated fraud upon the belligerents; by covering up the voyage under false papers, and with a false destination. This

is the general doctrine when the capture is made in transitu, while the contraband goods are yet on board. But when the contraband goods have been deposited at the port of destination, and the subsequent voyage has thus been disconnected with the noxious articles, it has not been usual to apply the penalty to the ship or cargo upon the return voyage, although the latter may be the proceeds of the contraband. And the same rule would seem by analogy, to apply to cases where the contraband articles have been deposited at an intermediate port on the outward voyage, and before it had terminated; although there is not any authority directly in point. But in the highest prize courts of England, while the distinction between the outward and homeward voyage is admitted to govern, yet it is established, that it exists only in favour of neutrals who conduct themselves with fairness and good faith in the arrangements of the voyage. If, with a view to practise a fraud upon the belligerent, and to escape from his acknowledged right of capture and detention, the voyage is disguised, and the vessel sails under false papers, and with a false destination, the mere deposit of the contraband in the course of the voyage, is not allowed to purge away the guilt of the fraudulent conduct of the neutral. In the case of the Franklin, in 1801, 3 Rob. 217, lord Stowell said, " I have deliberated upon this case, and desire it to be considered as the settled rule of law received by this court, that the carriage of contraband with a false destination, will make a condemnation of the ship, as well as the cargo." Shortly afterwards, in the case of the Neutralitet, 1801, 3 Rob. R. 295, he added, " the modern rule of the law of nations is, certainly, that the ship shall not be subject to condemnation for carrying contraband goods. The ancient practice was otherwise; and it cannot be denied that it was perfectly justifiable in principle. If to supply the enemy with such articles is a noxious act with respect to the owner of the cargo, the vehicle which is instrumental in effecting that illegal purpose, cannot be innocent. The policy of modern times has, however, introduced a relaxation on this point; and the general rule now is, that the vessel does not become confiscated for that act. But this rule is liable to exceptions. Where a ship belongs to the owner of the cargo, or where the ship is going on such service under a false destination or false

papers ; these circumstances of aggravation have been held to constitute excepted cases out of the modern rule, and to continue them under the ancient rule." The cases in which this language was used, were cases of capture upon the outward voyage.(a) The same doctrine was afterwards held by the same learned judge to apply to cases, where the vessel had sailed with false papers, and a false destination upon the outward voyage, and was captured on the return voyage.(b) And, finally, in the cases of the Rosalia and the Elizabeth, in 1802, 4 Rob. R., note to table of cases, the lords of appeal in prize cases held, that the carriage of contraband outward with false papers, will affect the return cargo with condemnation. These cases are not reported at large. But in the case of the Baltic, 1 Acton's R. 25, and that of the Margaret, 1 Acton's R. 333, the lords of appeal deliberately reaffirmed the same doctrine. In the latter case, sir William Grant, in pronouncing the judgment of the court said, "the principle upon which this and other prize courts have generally proceeded to adjudication in cases of this nature (that is, where there are false papers), appears simply to be this ; that if a vessel carried contraband on the outward voyage, she is liable to condemnation on the homeward voyage. It is by no means necessary that the cargo should have been purchased by the proceeds of this contraband. Hence we must pronounce against this appeal ; the sentence (of condemnation) of the court below being perfectly valid and consistent with the acknowledged principles of general law."

We cannot but consider these decisions as very high evidence of the law of nations, as actually administered : and in their actual application to the circumstances of the present case, they are not, in our judgment, controlled by any opposing authority. Upon principle, too, we trust, that there is great soundness in the doctrine, as a reasonable interpretation of the law of nations. The belligerent has a right to require a frank and bona fide conduct on the part of neutrals, in the course of their commerce in times of war ; and if the latter will make use of fraud, and false papers, to elude the just rights of the belligerents, and to cloak their own illegal purposes, there is

(a) See also the Edward, 4 Rob. R. 68.
(b) See the Nancy, 3 Rob. 122; the Christianberg, 6 Rob. 376.

no injustice in applying to them the penalty of confiscation. The taint of the fraud travels with the party and his offending instrument during the whole course of the voyage, and until the enterprise has, in the understanding of the party himself, completely terminated. There are many analogous cases in the prize law, where fraud is followed by similar penalties. Thus, if a neutral will cover up enemy's property under false papers, which also cover his own property, prize courts will not disentangle the one from the other, but condemn the whole as good prize. That doctrine was solemnly affirmed in this court, in the case of the St Nicholas, 1 Wheaton 417, 3 Cond. Rep. 614.

Upon the whole, our opinion is, that the general question involved in the second and third questions, whether there was a legal and justifiable cause of capture under the circumstances of the present case, ought to be answered in the affirmative. The question, as to the authority of the cruiser to seize, so far as it depends upon her commission, can only be answered in a general way. If she had a commission under the royal authority of Spain, she was beyond question entitled to make the seizure. If Rodil had due authority to grant the commission, the same result would arise. If he had no such authority, then she must be treated as a non commissioned cruiser, entitled to seize for the benefit of the crown; whose acts, if adopted and acknowledged by the crown or its competent authorities, become equally binding. Nothing is better settled both in England and America, than the doctrine, that a non commissioned cruiser may seize for the benefit of the government; and if his acts are adopted by the government, the property, when condemned, becomes a *droit* of the government.(a)

The fourth and fifth questions involve the point as to the authority of Rodil. The fourth is in the following terms. Whether a general in the military service of Spain, subordinate to La Serna, viceroy of Peru, under the king of Spain, not having the actual and exclusive command at Callao, and no civil authority existing therein, and cut off by the forces of the

(a) The Amiable Isabella, 6 Wheat. Rep. 1, 5 Cond. Rep. 1 ; The Dos Hermanos, 10 Wheat. Rep. 306, 6 Cond. Rep. 109; The Melomane, 5 Rob. 41 ; The Elsebe, 5 Rob. 174 ; The Maria Francoise, 6 Rob. 282.

enemy by sea or land from all communication with any superior civil or military officer, could lawfully seize and detain neutral property from contraband trade, if just cause existed for a condemnation thereof. The fifth question is, whether such officer, so situated, has a right to appoint and constitute a court, of which he himself is one, for the trial and condemnation of such property. These questions are both understood to refer to the supposed authority of Rodil as an officer of the government, to make the seizure in his official capacity. We are of opinion, that no sufficient facts are stated to enable this court to give any opinion as to the nature or extent of the authority of such an officer under the laws of Spain, or his commission from and under the Spanish government. We shall therefore return an answer to them, declaring that they are too imperfectly stated to admit of any opinion to be given by this court.

The sixth and last question is, whether, supposing the ship to have traded in articles contraband of war in the ports of Chili, and to have been seized afterwards in a port of Peru, then under the royal authority, before she had discharged her outward cargo, for and on account of such contraband trade, the underwriters be not discharged, whether the subsequent proceedings for her adjudication were regular or irregular. This question is understood to raise the point, whether, if the seizure and detention be bona fide for and on account of illicit or contraband trade, a sentence of condemnation or acquittal, or other regular proceedings to adjudication, are necessary to discharge the underwriters. We are of opinion that they are not. If the seizure or detention be lawfully made for or on account of illicit or contraband trade, all charges, damages and losses consequent thereon, are within the scope of the exception. They are properly attributable to such seizure and detention as the primary cause, and relate back thereto. If the underwriters be discharged from the primary hostile act, they are discharged from the consequences of it. The whole reasoning in Church v. Hubbard, 2 Cranch 187, presupposes, that if the underwriters be exempted from the risk of a justifiable seizure for illicit trade, they are not accountable for losses consequent thereon, whether arising from a sentence of condemnation or otherwise.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Massachusetts, and on the points and questions on which the judges of the said circuit court were divided in opinion, and which were certified to this court for its opinion, agreeably to the act of congress in such case made and provided, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that upon the question so certified by the circuit court for the district of Massachusetts, upon which the judges of that court were opposed in opinion, the opinions of this court be certified to that court as follows, to wit :—Upon the first question, " whether a seizure and detention, to come within the exception of the policy relating to contraband and illicit trade, must be for a legal and justifiable cause." That it is the opinion of this court, that the seizure and detention, to come within the exception of the policy relating to contraband and illicit trade, must be for a legal and justifiable cause. Upon the second question, "whether, assuming the other facts to be as stated and alleged above, and taking the authority of the seizing vessel to be such as the plaintiffs allege there was a legal and justifiable cause for the seizure and detention of the General Carrington and her cargo." That it is the opinion of this court, that assuming the facts stated in that question, there was a legal and justifiable cause for the seizure and detention of the ship General Carrington and cargo. Upon the third question, "whether, assuming the other facts to be as stated and alleged above, and taking the authority of the seizing vessel to be such as the defendants allege, there was a legal and justifiable cause for the seizure and detention of the General Carrington and her cargo." That it is the opinion of this court, assuming the facts stated in that question, there was a legal and justifiable cause for the seizure of the ship General Carrington and cargo. If the armed vessel referred to was lawfully commissioned by Rodil, (upon which this court can pronounce no opinion) then she is to be deemed entitled to make the seizure and detention in the same manner as if she had been commissioned by the royal authority of Spain. But if she was not so commissioned, then the parties making the seizure and detention are to be treated as non commissioned cruisers, seizing for the government of Spain;

and their validity depends upon their adoption and recognition by the competent authorities of Spain, according to the general principles of the law of nations on this subject. Upon the fourth question, "whether a general in the military service of Spain, subordinate to La Serna, viceroy of Peru, under the king of Spain, but having the actual and exclusive command of Callao, and no civil authority existing therein, and cut off by the forces of the enemy by sea and land from all communication with any superior civil or military officer, could lawfully seize and detain neutral property for contraband trade, if just cause existed for a condemnation thereof." And the fifth question, "whether such officer, so situated, has a right to appoint and constitute a court, of which he himself is one, for the trial and condemnation of such property." That it is the opinion of this court, that the facts are too imperfectly stated to enable this court to ascertain and decide what are the nature and extent of the powers of such an officer, according to the laws of Spain, or his commission from and under the Spanish government. Upon the sixth question, "whether, supposing the ship to have traded in articles contraband of war in the ports of Chili, and to have been seized afterwards in a port of Peru, then under the royal authority, before she discharged her outward cargo, for and on account of such contraband trade, the underwriters be not discharged, whether the subsequent proceedings for her adjudication were regular or irregular." That it is the opinion of this court, that under the circumstances stated in that question, the underwriters are discharged, whether the subsequent proceedings, after the seizure and detention of the ship and cargo for their adjudication, were irregular or not.