## STRONG v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 87. Submitted January 14, 1878. — Decided February 11, 1878.

By the terms of a charter party to the United States, the owner of a vessel undertook to keep her tight, staunch, strong and sound, and her machinery, boilers and everything pertaining to her in perfect working order, and to provide her with everything necessary for efficient sea-service. The government undertook to deliver the vessel to the owner in New York at the expiration of the charter party in as good condition as she was at the signing of it, ordinary wear and tear, damage by the elements, bursting of boilers, breaking of machinery excepted. The vessel was injured and sunk by a marine risk assumed by the charterer while engaged in the transportation of stores and men in the waters of North Carolina. She was raised and taken to New Berne, where she was tem-

porarily repaired by the government; but, being found out of order, was discharged at Port Royal by the government, and taken to New York by the owner. *Held*, that by reason of the failure of the owner to keep the vessel tight, staunch, strong and sound, the government was relieved from its liability to deliver the vessel to the owner in New York.

Mr. Justice Harlan delivered the opinion of the court.

In this action upon a charter party, executed March 15, 1862, between Strong and the United States, for the use of his steamer Ocean Wave, he asks judgment for the amount he expended in repairing her after she had been discharged from the service of the government, and also for *per-diem* compensation, at the rate fixed in the contract, for the time occupied in taking her from Port Royal, North Carolina, to New York, and in repairing her.

The Court of Claims was equally divided upon the question of his right to recover, and his petition was dismissed.

By the terms of the charter party the government was entitled to the whole and exclusive use of the steamer during the term she was in its service. To the extent of her capacity, it was the duty of Strong to receive and transport all the "passengers" and the "stores, wares and merchandise" which the government might send to her. Her use was not limited to any particular waters, and as it was clearly within the contemplation of the contracting parties that she would be employed in aid of the military forces then engaged in the war for the maintenance of the Union, sending her to the waters of North Carolina and there employing her for the transportation of stores and men were clearly authorized by the charter party. Munitions of war were "stores," and soldiers, "passengers," within the meaning of that instrument.

Nor was it an unauthorized use of the vessel to send her up the Neuse River with other boats, on the expedition ordered in December, 1862, by General Foster, of the Federal forces. Before starting, a thirty-pound Parrott gun and its carriage, such as are used on naval vessels, together with ammunition for the gun, and seventeen artillerymen, with their small arms and provisions for the expedition were put on board. The presence of the artillerymen on the vessel was certainly not inconsistent with the terms of the charter party. In reference to the gun, it is claimed by Strong that the vessel had not the capacity to bear safely such a heavy piece of artillery, and, consequently, that such a use of her was prohibited by the charter party. Her captain objected at the time to the gun being placed on her, but his objections were disregarded. It is not stated in the findings whether the gun was placed on the

vessel for her protection, or for offensive operations against the rebels. But it is found that after she left the vicinity of the rebel fort, the reduction of which seemed to be the object of the expedition, the gun was used to meet an attack of rebel infantry, who fired from the shore into the vessel. The concussion of the firing "swept off the bulwarks and netting in the track of the explosion," and one of the effects was "to start the joiner work, and to break in some of the panels of the doors, and to take a part of the rail off." Upon the same occasion she struck an overhanging tree, which took off a part of the wheel house and swept off both of the flagstaffs, and all the awning stanchions. Proceeding down the river, and when three miles above New Berne, she struck a snag and sunk. She was raised and taken to New Berne, and there "temporarily repaired by the government."

Casualties such as striking trees and snags, and sinking, were clearly marine risks which the owner expressly assumed, and the fact that during the expedition when they occurred the vessel was managed by a pilot placed on her by the government officers cannot affect the rights of the parties. The captain does not appear to have made any objection to such a pilot, nor is it claimed that the latter was negligent or unskilful in the discharge of his duty. On the contrary, he belonged to the neighborhood, and was familiar with the river. In regard to the claim for damages resulting from the firing of the gun, we remark that if such use of the vessel were conceded to be in violation of the charter party, we should be unable to ascertain from the record the amount of those damages. How far they were met by the temporary repairs made by the government, upon the return of the vessel from the expedition, is not stated. When she reached New York, after having been discharged from service, it is stated in the findings that she was "generally repaired throughout." What portion of these general repairs was chargeable to the injuries occasioned by the marine risks which the owner assumed, and what portion, if any, was chargeable to the injuries caused by war risks which the government assumed, cannot be determined from the record.

The only question which remains to be considered, is that arising on the asserted liability of the government for the *per-diem* compensation for the time spent in taking the vessel from Port Royal, and in repairing her in New York. The charter party, it is true, expressly provided that she "was to be delivered to the owner in the port of New York, at the expiration of the charter, in as good condition" as she was at its date, "ordinary wear and tear, damage

by the elements, bursting of boilers, breaking of machinery, excepted." In view of this stipulation, was the government, under the facts established, relieved from the duty of delivering her at New York? We think it was. By the terms of the charter party the owner was bound, at his own expense, to keep the vessel tight, staunch, strong and sound, and her machinery, boilers and everything pertaining to her in perfect working order, and to provide her with everything necessary for efficient sea-service. Any time which might be lost by reason of the machinery not being in order was to be deducted from the amount claimed to be due at the expiration of the charter. Now, it appears that on the 4th of March, 1863, the vessel was out of order and condemned by the government inspectors, and for those reasons was discharged at Port Royal from the service of the government. It does not appear that this condemnation was improper or unjust. It is not pretended that she was at that time fit for efficient sea-service. The agreement of the government to pay two hundred dollars per day for the use of the vessel was upon the condition — whether precedent or concurrent is immaterial — that the owner would keep her in good order. His neglect of that duty, by reason of which she became unsafe and worthless for the purposes for which she had been hired, authorized the government to abandon the contract and discharge her from its service. Its obligation to deliver her at New York was concurrent only with his to keep her in proper condition, and inasmuch as she was out of order and unfit for use, it had the right to discharge her at Port Royal, and was relieved from the duty of delivering her to him at New York. His refusal to execute the contract gave the government the option to rescind it.

*Judgment affirmed.*

*Mr. Thomas J. Durant* and *Mr. Charles W. Hornor* for appellant.

*Mr. Attorney General* and *Mr. Assistant Attorney General Smith* for appellee.