## RONALDS v. LEITER.

### (Circuit Court of Appeals, Second Circuit. June 11, 1901.)

### No. 63.

1. **SHIPPING—CHARTER—WARRANTY OF SEAWORTHINESS.**
   A warranty of seaworthiness at the commencement of the voyage is implied from the owner's agreement to insure and from the obligation put on the charterer by the charter "to return the yacht," or "to pay any loss or damage sustained by her not covered by the policy of insurance"; the policy, in absence of a showing to the contrary, being presumptively wholly avoided by the yacht's unseaworthiness.[1]

2. **SAME—CHARGES FOR TOWAGE—CHARTER HIRE.**
   The vessel, though warranted seaworthy at the commencement of the voyage, not having been so, and having broken down from that cause, and the charterer having then abandoned use of her for charter purposes, but repaired her and returned her to the home port, and paid for the repairs, and having been charged for the vessel at charter rates till her return, which together exceeded what it would have cost to tow her, the owner, on appeal, cannot complain that the charterer was allowed what it would have cost to have towed her back, the owner, in addition to demanding her return, having written that he would not be responsible for repairs or towage. The charterer, not having appealed, cannot now object to the charge allowed on the trial for charter hire after the breakdown.

In Error to the Circuit Court of the United States for the Southern District of New York.

See 84 Fed. 894.

William H. Sage, for plaintiff in error.
Robert H. Griffin, for defendant in error.

[1] Implied warranty of seaworthiness, see note to The Carib Prince, 15 C. C. A. 388.

Before SHIPMAN, Circuit Judge, and WHEELER and BROWN, District Judges.

BROWN, District Judge. This case comes up on a writ of error from a judgment entered January 26, 1899, on the verdict of a jury in favor of Joseph Leiter, the plaintiff below, for the sum of $4,073.61, damages sustained through the unseaworthiness of the steam yacht Reva, which the plaintiff had chartered from the defendant on November 4, 1896. The charter was for two months from November 9, 1896, for the sum of $3,000, which was paid in advance. There was no express warranty of seaworthiness. The owner agreed to deliver the yacht "fully equipped for a cruise to Galveston, Texas, with fully uniformed crew on board, 14 men, to be rigged out at owner's expense  *  *  *  the hirer to pay wages, provisions of crew and all running expenses of said yacht from the day of delivery to the surrender of said yacht to owner in New York harbor at the expiration of the charter or extension thereof, free and clear of all liens and liabilities incurred during the charter or extension thereof, in as good condition as at the start, fair wear and tear from reasonable and proper use only excepted." The owner agreed "to pay the premiums on a first-class policy to cover marine risks, fire and collision, to be approved by the hirer, and the owner to assume all risk covered by such marine policy; the hirer to be responsible for any loss or damage incurred by the yacht, machinery or equipment not covered by the policy." The hirer had also an option of extending the charter at pro rata rates by giving 15 days' notice prior to January 9, 1897, to Thomas Manning, broker. No extension of the charter period of two months was made; but the pleadings show that about December 13th permission was given the yacht to cruise in Mexican waters as far as Tampico.

On November 25th, the Reva reached Galveston where the charterer joined her. On December 20th while en route to Tampico and near that port the hanger which supported the outboard end of the propeller shaft fetched away, so that that end of the starboard shaft broke off close to the hull and with the starboard propeller fell into the sea. The break knocked a hole in the hull, causing the yacht to leak badly. That evening with the aid of the port engine and the propeller, the yacht made Tampico. Two surveys were thereupon made upon the request of Capt. Ray, the respondent's master, resulting in the recommendation that the hull be temporarily repaired and the yacht taken in tow to Galveston or New Orleans and there placed in the dock and properly repaired, there being no sufficient dock in Tampico. On January 4th, on receipt of this report, the charterer telegraphed notice of it to Manning, who immediately notified the owner, by whom the insurance company was also notified. On January 7th the yacht left Tampico in tow and reached Galveston on the 10th. The next day the charterer abandoned the cruise and left Galveston for his home, leaving his uncle, the only person who had accompanied him on the trip, at Galveston "to look after the repairs to the ship."

On January 12th the owner at New York wrote Mr. Manning:

"I wish to put in formal shape my statement that I will not in any way be responsible for repairs made to said yacht or for towage or in any other way. Mr. Leiter is to return the yacht to me at this city, and I do not intend that any repairs shall be done on my order, for which it may be claimed I am responsible."

The record does not show the precise time at which this notice was communicated to Mr. Leiter, but it must have been soon afterwards. The repairs were proceeded with at Galveston in accordance with the recommendation of the master's surveys at Tampico, and further surveys at Galveston; and on January 28th, the yacht by means of those repairs proceeded north under her own steam, and arrived at New York and was surrendered to the owner on February 27th, as above stated.

The court at the trial disallowed as damages all the costs and expenses of the repairs at Galveston, the cost of the maintenance of the yacht and the crew during the detention there and afterwards, and charged the charterer for the use of the vessel at charter rates until her delivery to the owner in New York. The court directed, however, that the charterer was entitled to offset what would be the fair and reasonable cost of towing the vessel from Galveston to New York in case the jury found the vessel to have been unseaworthy when chartered, and that she was not able to proceed with safety from Galveston to New York by means of her port propeller and her sails; but if so able, that such cost of towage should not be allowed. The jury by their verdict found the vessel to have been unseaworthy when chartered, and allowed $4,400 for what it would have cost to tow the yacht from Galveston to New York in her condition.

A warranty of seaworthiness at the commencement of the voyage is legally implied; this warranty was an implied condition of the charterer's obligation "to return the yacht," or "to pay any loss or damage sustained by her not covered by the policy of insurance." The record does not show the terms of the policy; but presumptively the policy was wholly avoided by the yacht's unseaworthiness.

The only other material exceptions of the plaintiff in error relate to the rule of damages allowed. We are of opinion that the rule adopted by the court below was sufficiently favorable to the owner. The vessel being found unseaworthy, the jury were directed in accordance with the decision of the supreme court in Strong v. U. S., 154 U. S. 632, 14 Sup. Ct. 1182, 24 L. Ed. 664, that the charterer might have abandoned the yacht on discovering this fact, without further liability to the owner. The charterer was also credited with a deduction for the expense of temporary repairs made at Tampico in stopping the leak and for the towage from Tampico to Galveston, as well as a deduction of 21 days' time at charter rates prior to the permanent repairs at Galveston. The repairs at the latter port were regarded as unauthorized, and the time occupied in thereafter returning the yacht to New York was charged to the charterer at charter rates until her delivery to the owner at New York; and this with the repairs exceeded what the jury found would have been the cost of towage.

The chief item of permanent repair was the broken shaft. The yacht had a spare propeller wheel on board, which was used with the repaired shaft. If the charterer was legally bound to take the yacht back to New York at his own expense, he would have been justified in doing so by means of those repairs as they were of a minor character and were in fact the readiest and least expensive method of returning her, as well as most beneficial to the owner. But the charterer was not under any such obligation; and having in fact abandoned the use of the yacht for charter purposes, his endeavors to return the yacht to the owner as required by the latter, for the latter's benefit, were no waiver of his rights nor any renewal of further charter obligations for maintenance or hire.

The demands of the owner in his letter of January 12th were unwarranted and inconsistent. He demanded that the vessel be returned to him at New York, but at the same time refused to be at any expense for repairs, or otherwise, in obtaining her return. He evidently did not understand that the yacht was unseaworthy when she sailed, that she had broken down from that cause, that he was liable for all the consequent damages and that he had no further claims upon the charterer, if he chose to abandon her for charter purposes.

The evidence shows that the charterer did so abandon her as respects any further use for charter purposes; and that the repairs at Galveston were made only for the purpose of returning the vessel to New York as the owner desired. The chief engineer, the owner's own appointee, testified:

"I think it was about three or four days that we had to wait before we got on the dry dock at Galveston. After we got on the dry dock we were all the rest of the time working on the boat, and we started north as soon as the work was completed—January 28th. We proceeded north with all expedition."

There is no evidence opposed to this, nor to the testimony that the charterer returned home from Galveston on the day after arrival there, and that he left his uncle behind only "to look after the repairs." The yacht had been chartered for a pleasure cruise along the coast of Texas and the Gulf, afterwards extended to Tampico. It is evident that the charterer had no use or benefit of the yacht for the purpose of the charter from the time of her breakdown through unseaworthiness on December 20th. As the charterer lost the contemplated use of the yacht from that time, and her return was only for the owner's convenience and benefit and in accordance with his demand, and as this was without any benefit to the charterer, and was no part of the charterer's legal obligation after her breakdown from unseaworthiness, there would seem to be no equity in charging him with any charter hire after December 20th. La Compania Bilbaina de Navegacion de Bilbao v. Spanish-American Light & Power Co., 146 U. S. 483, 499, 13 Sup. Ct. 142, 36 L. Ed. 1054. The owner having thereupon refused to be at any expense for repair, and demanded that the vessel should be returned to him at New York, he cannot complain that the cost of towage, the only other possible means of her return, was charged against

him. The charterer's endeavor, after the breakdown, to get the yacht to her owner in accordance with his demand, instead of abandoning her on the spot, was in no way prejudicial to the owner, nor beneficial to himself, and hence was no waiver of his own legal right to a release from further charter obligations. Had the charterer appealed, the question would have been presented whether the charge made against him of $2,550 for the charter hire up to the day of delivery at New York was a proper charge. But the charterer has not appealed, and as the owner has had the full benefit of that charge for hire and the benefit of the repair to the shaft as well, and has also been relieved of all the costs of the detention and maintenance of the yacht at Galveston and afterwards, we think he at least has no cause of complaint.

The exceptions are overruled and the judgment is affirmed.