---

## THE ELY.

,District Court, S. D. New York. August 8, 1901.)

1. SHIPPING—SUBCHARTER—DEVIATION FROM CHARTER—LAWFUL EMPLOYMENT.

March 1, 1898, a British steamship was chartered for six months, to be employed in carrying "lawful merchandise and passengers" between American ports, not further south than the river Plate, South America, the owner to provide officers and crew. May 31st she was subchartered to a newspaper company for one month, "to be employed in carrying lawful merchandise (excluding all injurious and unlawful cargo) within the United States, West Indies, and Central America. It is understood boat is to be used as a dispatch boat, and to follow the fleet of the U. S. navy as closely as prudent and safe." There was no provision in the original charter forbidding a subcharter. *Held*, that the subcharter

was valid, and one which the charterer was authorized to make; the use of the vessel contemplated thereby being within the terms of the original charter, lawful in itself, and not in violation of the neutrality laws.

**2. SAME—RIGHTS OF CHARTERER—RISKS INCIDENT TO WAR.**
The liability of a time charterer of a ship to the owner is no different because by reason of the breaking out of a war after the execution of the charter the risk to the vessel is increased, such risk being that of the owner; nor is the charterer bound to employ the vessel in the safest business, but he may employ it in any business which is lawful, and not in violation of the charter.

**3. SAME—LIABILITY OF CHARTERER—LOSS THROUGH SEA PERILS.**
The fact that a time charterer of a vessel subchartered her, to be used as a newspaper dispatch boat in time of war, such employment being lawful, and within the terms of the charter, does not render him liable for a loss or injury arising from sea perils, merely because in such service she was subjected to different perils from those she would have encountered if she had been employed in the carrying of cargoes.

**4. SAME.**
As between owner and charterer, the charterer's violation of the terms of the charter does not make him responsible for damages by marine perils in no way brought about by such violation.

**5. SAME—VIOLATION OF NEUTRALITY LAWS.**
A time charterer of a British steamer, on the opening of the Spanish-American war, subchartered her for use as a newspaper dispatch boat; the subcharter providing that she should carry only lawful merchandise. She was at all times in charge of officers and crew supplied by the owner. She took on board a number of reporters, with supplies, and cruised off the south coast of Cuba among the American naval fleet, making occasional voyages to Jamaica and other points to send dispatches, and on other lawful business of the subcharterer. On her return from one of such voyages, she was stranded, solely by reason of negligent navigation, and sustained great injury. Previously, by the conjoint action of the master and reporters on board, several small services of accommodation and courtesy had been rendered to officers of the American fleet and to its hospital ship, such as taking letters to mail, supplying ice to the hospital ship, and on one occasion transporting a small quantity of provisions to some ununiformed Cubans on shore. *Held* that, conceding such acts to have been in violation of the neutrality laws, being unauthorized by the subcharter and unknown to the charterer or subcharterer, and having no connection with the stranding of the steamer, they did not render the charterer liable for the loss.

In Admiralty. Libel by charterer to recover unearned charter hire paid in advance, and cross libel by owner for damages for breach of charter.

Butler, Notman, Joline & Mynderse, for charterers.
Convers & Kirlin, for owners.

BROWN, District Judge. The above libel, filed October 12, 1899, and the cross libel, filed February 1, 1900, grow out of a charter of the English steamship Ely for six months from time of delivery, to the above libelants Bowring & Archibald, made at New York on March 1, 1898, and a subcharter by the latter to the New York Journal for one month, made May 31, 1898. On the evening of June 29, 1898, while in use as a press dispatch boat under the subcharter, the steamer was stranded on the south coast of Jamaica on a coral reef near Rocky Point and the voyages broken up. On the next day, the libelants, in ignorance of the loss, paid to the owners on account of

hire, in advance, the sum of $1,371.34, which the libel seeks to recover back, together with $1,120 for 110 tons of coal on board at the time of the loss, and other items, making in all $3,132.39.

The cross libel seeks to charge the charterers with the owner's damages from the stranding of the steamer, to the amount of $64,784.70, in consequence of an alleged deviation from the charter party through the alleged unauthorized and unlawful employment of the vessel in a business outside the scope of the charter, by sending her with newspaper reporters as a dispatch boat to follow ships of war of the United States, then at war with Spain, to visit blockaded ports in Cuba, and to carry dispatches from the ships of war, animals and goods contraband of war, and to deliver supplies to the armed forces of the United States and also in Cuba.

The Ely is a steamer 200 feet long by 29¼ feet beam and 873 gross tons. The original charter was written upon a form headed "Fruit Time Charter," and provided that the steamer was—

"To be employed in carrying lawful merchandise, including petroleum or its products in cases, and passengers so far as accommodations will allow (accommodations for six cabin passengers) between ports in Canada * * * and or South America not south of the river Plate; * * * the owners to pay for provisions and wages of officers and crew, for engine room and deck stores, and to provide victualing for passengers, * * * charterers paying therefor at the rate of four shillings per day for each passenger * * * steerage or deck passengers at 35 cts. per day.

"The charterers to pay for all coal, port charges, &c. * * * and for the use of the vessel £580 sterling per month, in half monthly payments in advance; * * * if vessel lost, hire not earned to be returned.

"The owners on expiration of the charter to pay for all coal left in the bunkers at the market price of the port' where she is re-delivered to them.

"The captain shall prosecute the voyages with the utmost dispatch."

The steamer was delivered to the charterers for service at Kingston, Jamaica, on April 15, 1898. Under a subcharter for a single voyage, she took a cargo of sugar from Guantanamo to New York; next a cargo of coal from New York to Vera Cruz, and thence she went to Montego Bay, Jamaica, where she arrived on June 2, 1898. On May 31st she was subchartered to the New York Journal for one month at the rate of $200 per day,

"To be employed in carrying lawful merchandise (excluding all injurious and unlawful cargo) within the United States, West Indies and Central America. It is understood boat is to be used as a dispatch boat, and to follow the fleet of the U. S. navy as closely as prudent and safe."

No copy of the charter was sent to Capt. Pearn, the master, or to the owner or its New York agent; but Bowring & Archibald telegraphed the following instructions to the master:

"Ely chartered time charter New York Journal for newspaper dispatches; delivery arrival Jamaica. Telegraph arrival to Dana H. Carroll, Kingston. Follow his orders. Do utmost give reporters comfortable quarters. Spare no efforts getting news and satisfactory service generally. We have two English boats chartered other newspapers giving splendid satisfaction. Have assured Journal you likewise. If satisfactory your gratuity fifty pounds monthly. Show this Carroll."

Carroll, at that time in Jamaica, was a correspondent of the New York Sun, with which the Journal had an arrangement for the joint use of the Ely. Capt. Pearn on June 2d telegraphed Carroll accord-

ingly and was instructed by him to proceed to Anotta Bay, a port on the north coast of Jamaica opposite Kingston, but to clear for Key West, as other dispatch boats had previously done. At noon of June 3d the steamer reached Anotta Bay, took Carroll on board, and by his directions proceeded, as the log states, "off Santiago de Cuba for war news."

At 5:30 a. m. of June 4th the Ely, according to the log,

"Arrived off Santiago amongst the war ships. Being a stranger several blank shots were fired at us. Noon, amongst the fleet cruising around—6 p. m. off shore, (7 miles says the engineer's log), for the night and lying to."

The American fleet was at that time blockading Santiago, and Guantanamo was in occupation of our military forces under Capt. McCalla, and used as a coaling station. On explanation of her business in collecting war news, the Ely had permission from Admiral Sampson and Capt. McCalla at both places to come and go as she liked. No Cuban telegraph offices being available, the Ely was obliged to go to other ports in order to cable the information she collected. To report her first dispatches, she returned to Kingston on June 6th, where Langdon Smith, a reporter for the Journal, joined her. From that time Smith, rather than Carroll, was recognized as the representative of the charterers in directing the ship.

From June 3d until she stranded on June 29th, the Ely was diligently engaged in the collection of war news along the south coast of Cuba for the Sun and the Journal. Mr. Carroll remained on board of her until three or four days before she stranded. Her movements, he says, depended "altogether upon the information we succeeded in collecting and the time necessary to reach a cable office."

To forward dispatches she went three times only to Kingston, and two or three times to Mole St. Nicholas, Hayti. No news was allowed to be forwarded which it was important to withhold; nor was the Ely the bearer of any public dispatches, although for the accommodation of the officers or men of the fleet and of the hospital ship Olivette, she received and mailed private letters to their friends or families.

Some other occasional acts, aside from her intended business were done as favors to the officers, or as a charity to the wounded in the hospital ship, such as bringing them bananas, limes and pineapples, as requested, which were obtained by the captain of the Ely and paid for by the officers. Once or twice he let them have a couple of barrels of potatoes from his own stock, and once sent ice to the hospital ship Olivette, specially for a wounded correspondent. On one occasion also Mr. Carroll reported to Capt. McCalla seeing persons not in uniform on shore west of Guantanamo raising and lowering a Cuban flag; and on Capt. McCalla's request, the Ely took them some bags or cases of provisions from Capt. McCalla with an officer to identify them.

During all this time there were numerous other reporters and from six to eight other dispatch boats engaged in similar work at Siboney, and others elsewhere. The Sun alone maintained two others, the Journal two or three others, and the World, the Herald and the Associated Press, one each.

In the latter part of June, Mr. Hearst, the proprietor of the Journal was off Siboney, where the U. S. military forces under Gen. Shafter had landed, about 12 miles east of the blockading fleet at Santiago. Mr. Hearst had several of his editorial or reportorial staff with him, but had not been able to obtain passage from Key West for the horses needed by them, and he consequently directed the Ely to obtain at Kingston four horses or mules for their own use in following the army inland at Siboney. Four horses were accordingly obtained and shipped on the Ely at Kingston on the 29th of June, together with blankets, saddles and bridles for them, and also some ice, wines, liquors and provisions, all for Mr. Hearst's own use. They were all manifested as "stores," and, clearing for Key West as before, the Ely at 5 p. m. sailed to the eastward, intending to land the horses at Siboney. The log entries are:

"5 p. m. steamed away for off Santiago; 6:05 pilot left; 8:15 p. m. spoke S. S. Premier, also press boat bound to Santiago. At 8:45 full speed ahead. Set Co. E. N. E. compass. At 10:20 felt the ship's bottom pounding heavily. The engine was immediately full speed astern, but too late to avoid stranding on Folly Reef, working continuously to turn ship around, but being aground aft failed."

The place of stranding was about six miles westerly from Morant Point Lighthouse, and a mile or two nearer the shore than the usual course of vessels bound around Morant Point. From Yallah Point, which the Ely passed at 8:20 p. m. four miles from land, she had set her course E. N. E., whereas the usual course from that point is east until Morant Point bears north, in order to get a good offing on account of reefs and currents. The master had gone below an hour before stranding, and the mate in charge of the navigation was not called as a witness. There is no doubt that the stranding was due solely to negligent navigation in setting a course running too near the shore. On an inquiry by a marine board at Kingston, the master was suspended for three months.

The owner tendered an abandonment of the ship to its insurers, which they refused to accept. She was afterwards got off by the owner on September 4th, temporarily repaired at Kingston, taken thence to Newport News, and after surveys there, to Baltimore, where her repairs were completed on December 24th, more than two months after the original charter had expired. She was insured against both marine risks and war risks by separate policies, and the loss, adjusted at £8,990–6–9, was all, except about £540 collected by the owner from the former policies.

The charterers' claims for reimbursement of the last payment of charter hire in advance, and for the coal and provisions, were promptly presented to the owner in July, 1898. Various items were objected to, and delay asked until an average adjustment was had. This was completed August 31, 1899, upon data supplied by the owner, and was introduced in evidence upon the testimony of the owner's manager. From this it appears that there were 112 tons of coal remaining in the Ely's bunkers at the time of the loss, which was partly subsequently used by the Ely and partly thrown overboard to lighten the ship, and that the owner collected insurance on that basis.

In the adjustment all the items claimed in libelants' Exhibit 2, making £53–2–9, were also allowed, most of which had also been approved by the master. There being still items in dispute, the libel was filed in October, 1899, and the cross libel in February, 1900, as above stated, and it was not until the latter date, nearly 20 months after the loss, that any claim was made that the charterers were responsible therefor.

1. The principal items of the libelants' claim are abundantly proved viz.:

| | | |
|---|---|---|
| (a) For advance hire............................................. | $1,371 | 34 |
| (b) For coal on board at time of stranding........................ | 1,120 | 00 |
| (c) The charterers advances as per Ex. 2 stated in the Gen. Ave. a/c p. 171................................................... | 257 | 63 |
| (d) Same, as per Ex. 3, except the items of two and six shillings.. | 199 | 63 |
| | $2,948 | 60 |

The items of two and six shillings do not seem to be proved.

The charter required the owner to pay for all shippings fees and repairs, and to keep the steamer in an efficient condition, and to prosecute voyages with "the utmost dispatch." To secure efficiency against all causes of delay, the subcharterers gave the master the unusually large gratuity of £50 per month. The charges for additional firemen and for scaling the boilers were evidently to secure this same "utmost dispatch," which the charter promised, and being needed for that purpose, those charges should be borne by the ship. The item of £3 for water on June 29th, the master suggests was for the horses and hence chargeable to the subcharterers. But evidently the master does not testify from positive knowledge, and the evidence does not show any probability that he is correct, first, because the water required for four horses for one or two days would be very insignificant in amount, and also because on the call at Kingston the week before, there was the same charge of £3 for water obtained at that time of the same company, when there were no horses on board; and that charge in Exhibit 2 was allowed in the average adjustment as a proper charge against the owner.

The claim for two days' delay in scaling the boilers from June 22d to June 24th, is not I think established. It was not a case within the literal terms of the charter, nor is it within its spirit, unless the delay caused by that work exceeded 24 hours; and no such delay appears. On the 19th at 6:30 p. m. the Ely left the Mole for Guantanamo where she arrived at 5:30 a. m. of the 20th. At 2:30 she was off Santiago; at 8 a. m. of the 21st she was "steaming west along the coast"; at noon, "back amongst the fleet and troop ships;" and at 6 p. m. "steamed away for Kingston," where she moored at 1 p. m. of the 22d and left at 10 a. m. of the 24th. There was therefore no interruption of the steamer's work by putting back in order to have the boilers scaled; and she was in port only 45 hours. In her other visits to Kingston, her stay was from 22 to 32 hours. On this occasion she took in stores, coal and water as before, and there is no proof, nor is it probable upon the preceding facts, that her stay in Kingston was delayed by scaling nearly as much as 24 hours. The

master testifies that the delay caused by scaling was only 12 hours. The scaling was needed at that time, as appears from the master's letter to the owner. Mr. Carroll denies that it was done on the charterers promise to pay the expense. It was a proper charge against the ship, as well as the painting.

Three countercharges are to be allowed to the owner, viz. $45 collected by the charterers for the board of 32 passengers for two days; $74.50 for victualing various pilots and passengers brought on board by the reporters in June; and $20 for fitting up stalls for the horses shipped on the 29th, making in all $139.50, deducting which from the charterers' claims as above allowed, leaves a balance in their favor on these accounts of $2,809.10.

As the cabin could accommodate but six passengers, the rest of the 22 must have been substantially deck passengers, and the ship cannot collect the full pay of one dollar per day for them as for cabin passengers. The sum of $45 actually collected by the charterers was much in excess of the rate of 35 cents per day allowed by the charter for deck passengers, and the steamer cannot therefore claim more than was collected. The other small items claimed for the owner are not established as debts of the charterers.

2. The principal claim of the owner viz. for the damages caused by the stranding, is I think also not established. The damages claimed are $14,032.88 for the loss of the use of the Ely till December 21st when her repairs were completed, and $50,751.82 for the cost of the repairs. These claims rest, as I understand, upon the contention (a) that the collection of news by hovering about the American fleet and along the coast of Cuba, was a deviation from the scope of the charter, involving greater risks, and that this, being outside of the contract, made the charterers responsible for any subsequent damage to the vessel however caused; (b) that the prosecution of the voyages for that purpose was a breach of neutrality and unlawful; (c) that the incidental acts above specified, in supplying articles of food and ice to the naval officers and hospital ship, taking horses on board and landing some provisions on the Cuban shore, were specially breaches of neutrality and unlawful.

The employment of the ship authorized by the original charter was without any restriction except that the cargo must be "lawful merchandise." It authorized the carriage of any lawful merchandise, passengers, and even live stock on deck. The heading of the form used, "Fruit Time Charter" is of no importance on this point. That form was probably selected because it contained in print many of the stipulations desired by the parties. The employment specified was, moreover, in the nature of a privilege and a restriction as respects cargo; not an obligation to carry anything. The charterers might have carried passengers only; or if circumstances prevented any use of the vessel at all, that would not have constituted a breach of the charter. The reporters received on board and provisioned by the ship were not members of the crew, and were therefore "passengers," for whom the ship was entitled to be allowed, and as I understand, has been allowed, the stipulated compensation of one dollar per day for victualing.

The subcharter itself was lawful and no violation of the terms of the original charter. There was no stipulation in the latter forbidding a subcharter, and it was therefore valid. The subcharter was made after the declaration of war between the United States and Spain, and its additional express stipulation, "excluding all injurious and unlawful cargo," was naturally more specific than the usual restriction to "lawful merchandise" contained in the original charter made before the war. The gathering of news for the press, was a perfectly lawful purpose; and the provision that this was to be done by following "the fleet of the U. S. navy as closely as prudent and safe," was equally lawful. It contemplated no violation of neutrality and no unlawful trade. The newspaper dispatches, and even the private letters of men and officers that were mailed, were not contraband, nor any violation of the Queen's proclamation of neutrality. The trips between Jamaica, Hayti, and the coast of Cuba, were within the geographical limits authorized by the original charter, and so far there was neither "deviation" from the charter, nor violation of neutrality.

Numerous cases of "deviation" are cited holding insurance policies thereby invalidated; also instances of misuse or excessive use in cases of bailments. But all of these present a distinct breach of an essential condition of the contract. In policies of insurance, a certain specified risk is assumed by the insurer and no risk beyond. That is the essential substance of the contract; and consequently the moment that risk is changed by the ship's taking a different route, or another trip, the insurance ceases and the contract ends. In bailments, the misuse or excessive use is a technical conversion, but even in these cases there is no liability, if it appears that the unauthorized use certainly did not cause or contribute to the damage. 5 Am. & Eng. Enc. Law (2d Ed.) 422-424; 3 Kent, Comm. *210; Maghee v. Transportation Co., 45 N. Y. 514, 6 Am. Rep. 124; Hastings v. Pepper, 11 Pick. 41; Lewis v. Smith, 107 Mass. 334; Sutcliff v. Seligman, 110 Fed. 560. But this charter was not a contract of indemnity against a specific risk, like insurance, nor was it even a bailment. The charter was not a demise of the vessel. The owner all the while remained in possession by the captain, officers and men who were appointed and paid by him and who managed her navigation; the charterers had only the right to the use of the vessel in making lawful voyages within the authorized geographical limits, which were never exceeded. The cases cited, therefore, have no true analogy to the present.

It is no doubt true that the risks attending these trips were somewhat different from those attending ordinary voyages in times of peace. But the subject of the charter contract was not sea risks, but sea voyages. Marine risks are an incident of all sea voyages, and it is immaterial, as respects the lawfulness of the voyage, whether these risks are altered or not, so long as the voyage and the use of the vessel actually made, are no violation of the charter. Whatever new and increased risks of the ship arise merely from new circumstances or conditions in the prosecution of lawful voyages under the charter, are risks of the owner. For the charterer does not warrant that the

risks shall not be increased. It was never supposed that a charterer must bear war risks of the ship, merely because war broke out after the charter was executed. Daily trips among the West India Islands would have been authorized by this charter; yet the marine risks of such trips would be much greater than in longer voyages. So all voyages with cargo not definitely contraband in time of naval warfare, are attended with greatly increased risks through the liability to seizure, though the seizure may be mistaken and temporary. These increased dangers and risks in no way diminish the charterers' rights, so long as he pursues his voyages within the chartered limits with lawful cargo, and attempts no unlawful acts.

The outbreak of the war after the original charter was made, gave new opportunities for the use of the steamer. The charterers had the right to make the most of their opportunity, so long as they did nothing prohibited by the charter or unlawful. Whether the risks of the ship or cargo were increased or not, was immaterial. In fact, both the owner and the charterers covered their own increased dangers by special policies against war risks. The owner makes no claim for the premiums paid for this insurance, and has no such right.

The only material questions on this branch of the case are, therefore, whether the charterers' use of the ship was lawful, and if not, whether that would make them answerable for a marine loss arising solely from negligent navigation. That the declared purpose of the subcharter and the general business of the Ely on these trips were in my opinion lawful, I have already stated. The several protesting letters of the owner to its New York agents after receipt of the master's telegram of June 8th, were evidently based upon a misapprehension naturally caused by the brief terms of that telegram, which was as follows: "Sail to-night Santiago. What about war risks?" The owner cabled on the same day in reply: "Refuse unlawful business." On the 10th the owner wrote to the master to the same effect (Exhibit 31) and also to its New York agent, protesting against any use of the steamer "in any way that could be construed as a breach of the neutrality laws, or trying to run the blockade," i. e. at Santiago. On June 21st the owner again wrote its agents:

"We gather from captain's cable the charterers are keeping her trading between Jamaica and Santiago. We have therefore to confirm our letter of the 10th," etc.

In all the protests the owner's evident supposition was that the charterers were engaging in an unlawful trade, in violation of neutrality, or running the blockade at Santiago; although in the letter of June 24th the owner mistakenly claimed more than that, viz. that the charterers had no right to "recharter" (subcharter) the steamer at all.

On the 28th of June the owner wrote Capt. Pearn that his letters of June 2d and 7th had been received. Those letters informed the owner of the subcharter to the New York Journal, of the Ely's cruising among the fleet off Santiago, of her return to Kingston, and of increased expenses. The owner made reply in respect to the expenses, but made no further objection as to the ship's business.

The master, however, as the representative of the owner, and being

in possession and control of the ship, understood perfectly that no unlawful trade or breach of neutrality was intended. There was never any trade or attempted trade with Santiago, or with any enemy port, nor any running of the blockade, or intention to do so. The steamer's trips near or-among the fleet were only such as were permitted by the naval commanders. There was no danger from the fleet or the shore, except the marine risks of navigation. The only shots fired toward the ship were one blank shot on two occasions only, to stop her approach before she was known, or her lawful purpose understood. She never received any damage from those risks; and had any unlawful business been intended, the master could, and from his telegrams and letters evidently would, have refused to make any such voyages.

On June 23d he writes the owner, referring to its previous telegram, and says:

"I received your cable to-day, we to do nothing unlawful in this business, which I will strictly adhere to" (Exhibit A 36).

On the 29th of June he wrote to the charterers:

"I am sailing to-night for the high seas. You will please note that I am taking mules (horses) and a large quantity of ice on board. I am trying to oblige all I can, and on the other hand to keep within the limits of neutrality. The a/c for ice in my provision a/c should be charged against the newspapers, as the hospital ships were out of ice for the wounded and I supplied them with this, and this quantity I have taken to make up for it" (Exhibit 7, February 14, 1901).

On July 24th he wrote the owner:

"The employment I was doing was steaming to and fro on the south side of Cuba, picking up news of the war and bringing same back to Kingston to be cabled to New York. * * * I have had, I must say, a great difficulty in keeping the ship employed as a dispatch boat, having been frequently watched and cross questioned by officials at Kingston as to my movements. I did all I could to please the charterers and keep within bounds" (Exhibit A 46).

And again on the 26th of August he writes the owner:

"Your letters dated May 20th, 24th, June 3d, 7th, 10th and 17th were received by me to-day. Regarding the trade in which the ship has been engaged since June 2d, I deny that any business of an unlawful character has been carried on. I was well aware of the state of things outside St. Jago not to attempt anything like blockade running, nor were there any neutrality laws infringed. I went into no ports from leaving Jamaica until I returned."

Accordingly, in the master's numerous letters to the owner and to Bowring & Archibald, the charterers, he never addressed any protest or objection to either, as regards the character of the business of the ship or of her voyages, except only as respects some increased expenses for provisions occasioned by the war, which would equally affect any other voyages with passengers. The fact also that the owners made no claim of this kind during upwards of a year while negotiations were pending for the settlement of the mutual claims between them and the charterers, nor until the filing of their cross libel and answer nearly two years after the loss, shows that no such claim as is now made was then supposed to exist.

As respects the incidental acts (c) above referred to, in supplying some fruit, and a few barrels of potatoes to the naval officers, and ice

to the hospital ship Olivette, as well as some provisions to Cubans on shore not in uniform, it is to be observed; (1) that none of those acts were authorized or contemplated by the subcharter; they formed no part of the business of the ship or of the intent of her voyages; they were in themselves trivial and unimportant, and in the nature merely of personal courtesies to the officers, or charity to the wounded, and not sufficient in amount or importance to give any character to the voyages or the employment of the ship; (2) that if regarded as of any importance, or as technically irregular, such acts were wholly unauthorized by the owner, or by the charterers or the subcharterer; they were done by the conjoint action of the master and the reporters, outside of the ship's business, and as personal favors; in doing them, the master represented the owner as much as the reporters represented the charterers, or the subcharterer; but as neither the master nor the reporters had any authority whatsoever from their respective principals for those acts, which, if unlawful, were in violation both of the charter and of the subcharter, they bound nobody but themselves. The direction to follow Carroll's orders, had reference only to orders connected with the authorized business of the ship. (3) Though this want of authority might not be material in an action upon a policy of insurance, it is otherwise in an action on a charter party, in which it is impossible to hold that individual unauthorized acts of this nature, outside of the business of the ship, could make the charterers responsible for a subsequent stranding to which the unauthorized acts in no way contributed. It might as well be claimed that the unlawful smuggling of some cigars by the master and reporters in their individual capacities, would make the charterers answerable for stranding through careless navigation on a subsequent voyage.

In reference, moreover, not only to these personal courtesies, but to the regular employment of the steamer as a press dispatch boat on all the trips prior to that on which she was stranded, the decision in the case of Strong v. U. S., 154 U. S. 632, 14 Sup. Ct. 1182, 24 L. Ed. 664, seems applicable, to the effect that in an action between owner and charterer, the charterer's violation of the terms of the charter does not make him responsible for damages by marine perils in no way brought about by such violation; so that whatever was done on voyages prior to that of the stranding, would be immaterial, and unauthorized acts on the same voyage would entail no responsibility except for some loss proceeding from those acts themselves, and none for losses by marine perils of navigation. See, also, White v. U. S., 154 U. S. 661, 14 Sup. Ct. 1192, 26 L. Ed. 178; Carrington v. Insurance Co., 8 Pet. 520, 8 L. Ed. 1021; The Joseph, 8 Cranch, 451, 455, 3 L. Ed. 621.

The four horses and accouterments shipped on the last voyage, as well as the liquors and ice, were all ordered for the use of the subcharterer and his correspondents alone; they were not connected with the army or navy and the articles were therefore neither contraband nor unlawful. One ton of the ice was for the steamer herself, and, as appears by the master's letter of June 29th above quoted, was taken to replace what he had previously given to the hospital

ship on the prior voyage. It does not appear from the evidence that any of the articles taken aboard on the last voyage were designed for any of the officers or men of the navy, whether as personal favors or otherwise.

On this branch of the case, therefore, I find that the business and employment of the steamer as a news-gatherer for the press, was neither unlawful nor in violation of any of the provisions of the charter or of the Queen's proclamation; and that the trifling personal courtesies and favors as between the master, the reporters and the naval officers, whether the acts were technically lawful or not, involved no responsibility on the part of the charterers for the subsequent damage to the steamer by stranding, to which those acts did not contribute; and that the same rule applies to the last trip also.

There should be decrees dismissing the cross libel with costs, and in favor of the original libelant for $2,809.10, with interest and costs.